

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE OCT 1 1 2018

Fairhurst, C.J.

CHIEF JUSTICE

This opinion was filed for record

at 8:00 a.m. on Oct 11, 2018

Susan L. Carlson

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 88086-7 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | EN BANC |
| | ) | |
| ALLEN EUGENE GREGORY, | ) | FILED OCT 1 1 2018 |
| | ) | |
| Appellant. | ) | |

FAIRHURST, C.J.—Washington's death penalty laws have been declared unconstitutional not once, not twice, but three times. *State v. Baker*, 81 Wn.2d 281, 501 P.2d 284 (1972); *State v. Green*, 91 Wn.2d 431, 588 P.2d 1370 (1979); *State v. Frampton*, 95 Wn.2d 469, 627 P.2d 922 (1981).[1] And today, we do so again. None

---

[1] Arguably, it has occurred four times because a federal district court judge found that our statutory proportionality review of death sentences violated due process. *Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1288-91 (W.D. Wash. 1994), *aff'd sub nom. on other grounds*, *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432 (9th Cir. 1995). But we considered and rejected the claim. *In Re Pers. Restraint of Benn*, 134 Wn.2d 868, 925-26, 952 P.2d 116.

of these prior decisions held that the death penalty is per se unconstitutional, nor do we. The death penalty is invalid because it is imposed in an arbitrary and racially biased manner. While this particular case provides an opportunity to specifically address racial disproportionality, the underlying issues that underpin our holding are rooted in the arbitrary manner in which the death penalty is generally administered. As noted by appellant, the use of the death penalty is unequally applied—sometimes by where the crime took place, or the county of residence, or the available budgetary resources at any given point in time, or the race of the defendant. The death penalty, as administered in our state, fails to serve any legitimate penological goal; thus, it violates article I, section 14 of our state constitution.

## I. FACTS AND PROCEDURAL HISTORY

A.    Factual background

In 1996, Allen Eugene Gregory raped, robbed, and murdered G.H. in her home.[2] In 1998, Gregory was investigated for a separate rape crime based on

---

[2] In Gregory's first appeal, we summarized the crime scene as follows:

> The evidence suggested that G.H. had been attacked in her kitchen. She was probably stabbed once in the neck and then dragged into her bedroom. G.H.'s work clothes had been cut off of her, and her hands were tied behind her back with apron strings. She was then stabbed three times in the back. In addition, she had three deep slicing wounds to the front of her throat. . . . The medical examiner concluded that G.H. suffered blunt force trauma to the head and she had several bruises, but the cause of death was multiple sharp force injuries to her back and neck. Semen was found in G.H.'s anal and vaginal swabs, on her thigh, and on the bedspread. The evidence suggested that she was still alive when she was raped. Missing from her home were a pair of diamond earrings, jewelry, and her cash tips from that evening.

allegations by R.S. In connection with that investigation, the Tacoma Police Department obtained a search warrant for Gregory's vehicle. In the vehicle, police located a knife that was later determined to be consistent with the murder weapon used to kill G.H. Police also obtained Gregory's blood sample during the rape investigation and used that sample to connect him to the deoxyribonucleic acid (DNA) found at G.H.'s crime scene. *State v. Gregory*, 158 Wn.2d 759, 812, 147 P.3d 1201 (2006) (*Gregory* I), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). After matching Gregory's DNA to that found at G.H.'s murder scene, the State charged Gregory with aggravated first degree murder. *Id.* Gregory was also charged and convicted of three counts of first degree rape stemming from R.S.'s allegations.

B.    Procedural history

In 2001, a jury convicted Gregory of aggravated first degree murder. *Id.* at 777, 812. The same jury presided over the penalty phase of his trial. *Id.* at 812. The jury concluded there were not sufficient mitigating circumstances to merit leniency and sentenced Gregory to death. *Id.* When Gregory appealed his murder conviction and death sentence, we consolidated our direct review of those issues with Gregory's appeal of his separate rape convictions. *Id.* at 777. We reversed the rape convictions,

---

*State v. Gregory*, 158 Wn.2d 759, 811-12, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014).

affirmed the aggravated first degree murder conviction, and reversed the death sentence. *Id.* at 777-78. We based our reversal of Gregory's death sentence on two grounds: (1) "the prosecutor engaged in misconduct during closing arguments in the penalty phase of the murder trial" and (2) "the rape convictions," which we reversed, "were relied upon in the penalty phase of the murder case." *Id.* at 777. We remanded the case for resentencing. On remand, the trial court impaneled a new jury to preside over a second special sentencing proceeding. Again the jury determined there were not sufficient mitigating circumstances to merit leniency and sentenced Gregory to death. Gregory appealed his sentence, raising numerous issues. In addition to any appeal, our court is statutorily required to review all death sentences. RCW 10.95.130(1). Pursuant to statute, we consolidate the direct appeal and death sentence review. *Id.*

Following remand, the State also prepared for a new rape trial. The State conducted interviews with R.S., but the interviews revealed that she had lied at the first trial. The State moved to dismiss the rape charges because R.S.'s inconsistent statements "ma[d]e it impossible for the State to proceed forward on [count I and count II]" and, given her statements, "the State d[id] not believe there [was] any reasonable probability of proving the defendant is guilty of [count III]." Clerk's Papers at 519. The trial court dismissed the rape charges with prejudice.

4

## II. ISSUES[3]

A.     Whether Washington's death penalty is imposed in an arbitrary and racially biased manner.

B.     Whether statutory proportionality review of death sentences alleviates the alleged constitutional defects of the death penalty.

C.     Whether the court should reconsider arguments pertaining to the guilt phase of Gregory's trial.

## III. ANALYSIS

A.     Historical background of the death penalty in Washington

A brief history of the various death penalty schemes in Washington serves to illustrate the complex constitutional requirements for capital punishment. *See also State v. Bartholomew*, 98 Wn.2d 173, 180-92, 654 P.2d 1170 (1982) (*Bartholomew I*), *vacated*, 463 U.S. 1203, 103 S. Ct. 3530, 77 L. Ed. 2d 1383 (1983) (similar historical discussion). In 1972, the United States Supreme Court nullified capital punishment laws in 39 states, including Washington, and the District of Columbia. *Furman v. Georgia*, 408 U.S. 238, 305, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972); *Baker*, 81 Wn.2d at 282; *State v. Lord*, 117 Wn.2d 829, 908, 822 P.2d 177 (1991) ("*Furman* prohibits sentencing procedures which create a substantial risk that death

---

[3] Since we hold that the death penalty is unconstitutional, we decline to address Gregory's other challenges to the penalty imposed or alleged errors that occurred during the penalty phase of the trial.

will be imposed in an arbitrary and capricious manner. In other words, where the death penalty is imposed wantonly and freakishly, it is unconstitutional." (citation omitted)). Three years later, by way of a ballot initiative, Washington enacted a new capital punishment law that required mandatory imposition of the death penalty for specified offenses. Initiative 316, LAWS OF 1975 2d Ex. Sess., ch. 9, *repealed by* LAWS OF 1981, ch. 138, § 24. But this, too, proved problematic. In 1976, the United States Supreme Court held that mandatory imposition of death sentences for specified homicides is unconstitutional. *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (plurality opinion); *Roberts v. Louisiana*, 428 U.S. 325, 96 S. Ct. 3001, 49 L. Ed. 2d 974 (1976). Consequently, we declared our capital punishment law unconstitutional. *Green*, 91 Wn.2d at 447. In contrast, Georgia's capital punishment law was upheld. *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality opinion). To be constitutionally valid, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189.

Our legislature enacted a new capital punishment law, allowing for the imposition of the death penalty where the jury, in a subsequent sentencing proceeding, found an aggravating circumstance, no mitigating factors sufficient to

6

merit leniency, guilt with clear certainty, and a probability of future criminal acts. LAWS OF 1977, 1st Ex. Sess., ch. 206 (codified in chapter 9A.32 RCW and former chapter 10.94 RCW, *repealed by* LAWS OF 1981, ch. 138, § 24). The statute was found unconstitutional because it allowed imposition of the death penalty for those who pleaded not guilty but did not impose the death penalty when there was a guilty plea. *Frampton*, 95 Wn.2d at 480. The legislature again refined our capital punishment law in an attempt to conform to various legal directives. Ch. 10.95 RCW. Our current statute is nearly identical to the Georgia statute. *State v. Harris*, 106 Wn.2d 784, 798, 725 P.2d 975 (1986) ("The language in our statute is identical to that used in the Georgia statute."); *cf. Bartholomew* I, 98 Wn.2d at 188 ("The statutory aggravating circumstances are similar but not identical to those of the approved Georgia statute.").

Chapter 10.95 RCW provides for a bifurcated proceeding—first the defendant is found guilty of aggravated first degree murder, and then a special sentencing proceeding is held before either a judge or a jury to determine whether there are sufficient mitigating circumstances to merit leniency. RCW 10.95.050, .060. If there are, the defendant shall be sentenced to life without parole. RCW 10.95.080. If the defendant is sentenced to death, the sentence is automatically reviewed by this court, in addition to any appeal the defendant seeks. RCW 10.95.100. Our statutorily mandated death sentence review proceeding requires this court to determine (a)

7

whether there was sufficient evidence to justify the judge's or jury's finding in the special sentencing proceeding, (b) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant, (c) whether the death sentence was brought about through passion or prejudice, and (d) whether the defendant had an intellectual disability. RCW 10.95.130(2).

Proportionality review "serves as an additional safeguard against arbitrary or capricious sentencing." *State v. Pirtle*, 127 Wn.2d 628, 685, 904 P.2d 245 (1995); *Harris*, 106 Wn.2d at 797. The goal is "to ensure that the death penalty's imposition is not 'freakish, wanton, or random[ ] and is not based on race or other suspect classifications.'" *State v. Davis*, 175 Wn.2d 287, 348, 290 P.3d 43 (2012) (alteration in original) (quoting *State v. Cross* 156 Wn.2d 580, 630, 132 P.3d 80 (2006)). The United States Supreme Court held that statutory proportionality review is not required by the federal constitution, *Pulley v. Harris*, 465 U.S. 37, 43-44, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984), but the impetus for it nonetheless derives from constitutional principles. *Lord*, 117 Wn.2d at 908 (proportionality review "was undertaken in Washington in response to the United States Supreme Court decision in *Furman*").

B.    Gregory's constitutional challenge to the death penalty is intertwined with our statutorily mandated proportionality review

Gregory challenged the constitutionality of the death penalty, supported with numerous reasons. He also presented a statutory argument, that his death sentence is excessive and disproportionate to the penalty imposed in similar cases. RCW 10.95.130(2)(b). Gregory claimed that his death sentence "is random and arbitrary, and, to the extent it is not, it is impermissibly based on his race and the county of conviction." Opening Br. of Appellant at 96 (underlining omitted). These assertions are precisely what proportionality review is designed to avoid. *See State v. Brown*, 132 Wn.2d 529, 554-55, 940 P.2d 546 (1997) ("In conducting proportionality review the court is principally concerned with avoiding two systemic problems . . . : random arbitrariness and imposition of the death sentence in a racially discriminatory manner.").

In *Davis*, our court grappled with proportionality review of the defendant's death sentence. "How to properly perform proportionality review, and upon what data, is a reoccurring, vexing problem in capital case jurisprudence across the nation." *Cross*, 156 Wn.2d at 636. The majority and dissenting opinions took different approaches disputing which factors were relevant and to what degree statistical evidence could be relied on. The majority saw "no evidence that racial discrimination pervades the imposition of capital punishment in Washington." *Davis*, 175 Wn.2d at 372. But the dissent believed that "[o]ne could better predict

9

whether the death penalty will be imposed on Washington's most brutal murderers by flipping a coin than by evaluating the crime and the defendant. Our system of imposing the death penalty defies rationality, and our proportionality review has become an 'empty ritual.'" *Id.* (Fairhurst, J., dissenting) (quoting *State v. Benn*, 120 Wn.2d 631, 709, 845 P.2d 289 (1993) (Utter, J., dissenting)). "We can, and must, evaluate the system as a whole." *Id.* at 388. Justice Wiggins specifically called on competent experts to present evidence on the "statistical significance of the racial patterns that emerge from the aggravated-murder trial reports." *Id.* at 401 (Wiggins, J., concurring in dissent).

In light of *Davis*, Gregory commissioned a study on the effect of race and county on the imposition of the death penalty. Opening Br. of Appellant, App. A (KATHERINE BECKETT & HEATHER EVANS, THE ROLE OF RACE IN WASHINGTON STATE CAPITAL SENTENCING, 1981-2012 (Jan. 27, 2014) [https://perma.cc/XPS2-7YTR]).[4] Subsequently, additional trial reports were filed. Beckett performed a new regression analysis and updated her report. KATHERINE BECKETT & HEATHER EVANS, THE ROLE OF RACE IN WASHINGTON STATE CAPITAL SENTENCING, 1981-2014 (Oct. 13, 2014) (Updated Beckett Report) [https://perma.cc/3THJ-989W]. The Updated Beckett Report supported three main conclusions: (1) there is significant

---

[4] For readability, we refer to Katherine Beckett and Heather Evans collectively as "Beckett."

county-by-county variation in decisions to seek or impose the death penalty, and a portion of that variation is a function of the size of the black population but does *not* stem from differences in population density, political orientation, or fiscal capacity of the county, (2) case characteristics as documented in the trial reports explain a small portion of variance in decisions to seek or impose the death penalty, and (3) black defendants were four and a half times more likely to be sentenced to death than similarly situated white defendants. *Id.* at 31-33. Gregory filed a motion to admit the Updated Beckett Report, which we granted.

The State raised many concerns about the reliance on Beckett's statistical analysis, arguing that this was an inappropriate forum for litigating facts and adducing evidence. The State was also concerned because Beckett had not been subject to cross-examination about her involvement with Gregory's counsel, her statistical methodology, and her overall reliability. The State requested an opportunity to challenge the Updated Beckett Report. We granted the request and ordered that a hearing be held before then Supreme Court Commissioner Narda Pierce. No actual hearing was held since the parties agreed on the procedures and Commissioner Pierce was able to solicit additional information through interrogatories. The State filed the report of its expert, and Gregory filed Beckett's response. NICHOLAS SCURICH, EVALUATION OF "THE ROLE OF RACE IN WASHINGTON STATE CAPITAL SENTENCING, 1981-2014" (July 7, 2016); KATHERINE BECKETT &

HEATHER EVANS, RESPONSE TO EVALUATION OF "THE ROLE OF RACE IN WASHINGTON STATE CAPITAL SENTENCING, 1981-2014" BY NICHOLAS SCURICH (Aug. 25, 2016). Commissioner Pierce reviewed these filings and then posed follow-up questions in interrogatory form. After receiving answers, Commissioner Pierce filed her report. FINDINGS AND REPORT RELATING TO PARTIES' EXPERT REPORTS (Nov. 21, 2017) (Commissioner's Report). The Commissioner's Report did not make legal conclusions or recommend how this court should weigh the evidence before us. Rather, the Commissioner's Report provided us with an overview of the disagreements between the experts and the overall strength and weakness of Beckett's analysis, which may impact the weight that we accord to her conclusions. The parties (and amici) filed supplemental briefing that shed further light on the issues raised in the Commissioner's Report and the overall assessment of Beckett's analysis. In turn, the Updated Beckett Report and the subsequent rigorous evidentiary process provided this court with far more system-wide information concerning the death penalty, enabling Gregory to use that information to substantiate his constitutional challenge as well. In his supplemental brief, Gregory incorporates the analysis and conclusions from the Updated Beckett Report to support his constitutional claim, arguing that the death penalty is imposed in an arbitrary and racially biased manner.

Given the intertwined nature of Gregory's claims, we have discretion to resolve them on statutory grounds, by solely determining if *his* death sentence fails the statutorily mandated death sentence review and must be converted to life without parole, or on constitutional grounds, by assessing our state's death penalty scheme *as a whole.* "Where an issue may be resolved on statutory grounds, the court will avoid deciding the issue on constitutional grounds." *Tunstall v. Bergeson*, 141 Wn.2d 201, 210, 5 P.3d 691 (2000). Because Gregory challenges the process by which the death penalty is imposed, the issue cannot be adequately resolved on statutory grounds. Proportionality review is a statutory task that this court must perform on the specific death sentence before us, but it is not a substitute for the protections afforded to all persons under our constitution.

C.    Washington's death penalty scheme is unconstitutional, as administered

1.    *Standard of review*

We review constitutional claims de novo. However, conducting a constitutional analysis in death penalty cases is slightly different from our traditional constitutional review. "The death penalty differs qualitatively from all other punishments, and therefore requires a correspondingly high level of reliability." *Pirtle*, 127 Wn.2d at 663; *see also Lord*, 117 Wn.2d at 888 (The death penalty is "subjected to a correspondingly higher degree of scrutiny than sentencing in noncapital cases.").

13

Gregory brought challenges under both the state and federal constitutions. We have "'a duty, where feasible, to resolve constitutional questions first under the provisions of our own state constitution before turning to federal law.'" *Collier v. City of Tacoma*, 121 Wn.2d 737, 745, 854 P.2d 1046 (1993) (quoting *O'Day v. King County*, 109 Wn.2d 796, 801-02, 749 P.2d 142 (1988)); *accord State v. Jorgenson*, 179 Wn.2d 145, 152, 312 P.3d 960 (2013) ("Where feasible, we resolve constitutional questions first under our own state constitution before turning to federal law."). If we neglect this duty, we "deprive[] the people of their 'double security.'" *Alderwood Assocs. v. Wash. Envtl. Council*, 96 Wn.2d 230, 238, 635 P.2d 108 (1981) (quoting THE FEDERALIST NO. 51, at 339 (A. Hamilton or J. Madison) (Modern Library ed. 1937)). "It is by now well established that state courts have the power to interpret their state constitutional provisions as more protective of individual rights than the parallel provisions of the United States Constitution." *State v. Simpson*, 95 Wn.2d 170, 177, 622 P.2d 1199 (1980) (plurality opinion).

Article I, section 14 of our state constitution provides, "Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted." Our interpretation of article I, section 14 "is not constrained by the Supreme Court's interpretation of the [Eighth Amendment]." *State v. Bartholomew*, 101 Wn.2d 631, 639, 683 P.2d 1079 (1984) (*Bartholomew* II); U.S. CONST. amend. VIII. This court has "repeated[ly] recogni[zed] that the Washington State Constitution's cruel

punishment clause often provides greater protection than the Eighth Amendment."

*State v. Roberts*, 142 Wn.2d 471, 506, 14 P.3d 713 (2000); *State v. Ramos*, 187

Wn.2d 420, 453-54, 387 P.3d 650 (quoting same passage), *cert. denied*, 138 S. Ct.

467 (2017).

> Especially where the language of our constitution is different from the analogous federal provision, we are not bound to assume the framers intended an identical interpretation. The historical evidence reveals that the framers of [the Washington Constitution, article I, section 14] were of the view that the word "cruel" sufficiently expressed their intent, and refused to adopt an amendment inserting the word "unusual."

*State v. Fain*, 94 Wn.2d 387, 393, 617 P.2d 720 (1980). A formal *Gunwall*[5] analysis

is not necessary when we apply established principles of state constitutional

jurisprudence. *Roberts*, 142 Wn.2d at 506 n.11.[6]

For example, in *Bartholomew* II, we adhered to our decision invalidating

portions of our capital punishment law on independent state constitutional grounds

rather than conforming our analysis to a recent United States Supreme Court case

affirming the death penalty against an Eighth Amendment challenge. 101 Wn.2d at

634 (referring to *Zant v. Stephens*, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235

---

[5] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

[6] We recognize that article I, section 14 is not per se broader than the Eighth Amendment. Under certain contexts, the court may have good reason to interpret the state and federal constitutions synonymously rather than independently. For example, in *State v. Dodd*, we found that article I, section 14 was not more protective than the Eighth Amendment when a capital defendant wanted to waive general appellate review in hopes of a speedier execution. 120 Wn.2d 1, 21, 838 P.2d 86 (1992). We later explained that the "ruling in *Dodd* is limited to the facts of that case." *State v. Thorne*, 129 Wn.2d 736, 772 n.10, 921 P.2d 514 (1996).

(1983)). Our decision rested "on an interpretation of both the state and federal constitutions," but the independent state constitutional grounds were "adequate, in and of themselves, to compel the result." *Id.* at 644 (relying on *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), so that any federal constitutional decision by the Supreme Court "will have no bearing on our decision"). However, in *State v. Yates*, we did not address the defendant's state constitutional argument because he could not "establish that chapter 10.95 RCW violates the Eighth Amendment, [so] his claim that the statute violates article I, section 14 of the Washington State Constitution is unavailing." 161 Wn.2d 714, 792, 168 P.3d 359 (2007). In contrast, the evidence here shows that Gregory *could* establish that Washington's death penalty violates both the federal and state constitutions. At the very least, article I, section 14 cannot provide for less protection than the Eighth Amendment, and in this case, we interpret it independently from the federal counterpart. Let there be no doubt—we adhere to our duty to resolve constitutional questions under our own constitution, and accordingly, we resolve this case on adequate and independent state constitutional principles. *See Long*, 463 U.S. at 1041-42.

2. *Our prior decisions upholding Washington's death penalty do not preclude Gregory's claim*

We have previously upheld the constitutionality of the death penalty under somewhat similar claims. In *Cross*, we rejected the defendant's argument that "the

16

death penalty in Washington is effectively standardless and that our proportionality review does not properly police the use of the penalty." 156 Wn.2d at 621; *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 731, 327 P.3d 660 (2014) (rejecting his constitutional claims again). We reaffirmed the holding in *Yates* under the federal and state constitutions. 161 Wn.2d at 792. Every decision of this court creates precedent that "[w]e do not lightly set aside." *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008).

However, "stability should not be confused with perpetuity," and major changes have taken place since our *Cross* opinion that support our decision to revisit the constitutionality of the death penalty. *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970). First, we have numerous additional trial reports for defendants convicted of aggravated murder that were not previously available to us or the defendants who made constitutional claims. Reply Br. of Appellant at 56 (judges have filed 120 additional trial reports since *Cross* was filed; 67 of those were filed after the *Cross* opinion was published and dozens were filed after Gregory's motion to complete process of compiling aggravated murder reports was filed). Second, Gregory commissioned a statistical study based on the information in the trial reports to demonstrate that the death penalty is imposed in an arbitrary and racially biased manner. Additionally, we allowed the State to challenge the Updated Beckett Report, subjected it to a thorough evaluation process

17

facilitated by our court commissioner, and accepted supplemental briefing from the parties and amici concerning the analysis and conclusions presented.

In *Davis*, this court saw "no evidence that racial discrimination pervades the imposition of capital punishment in Washington." 175 Wn.2d at 372. That is precisely what has now come to light and warrants our consideration. *See Roper v. Simmons*, 543 U.S. 551, 564-69, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (reconsidering precedent upholding the death penalty for juvenile offenders, supported by scientific and sociological studies about the differences between juveniles and adults, and objective indicia of society's view of juveniles); *Atkins v. Virginia*, 536 U.S. 304, 314, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (reconsidering precedent upholding the death penalty for intellectually disabled defendants, because "[m]uch has changed since then," including objective indicia that society's views on the execution of such defendants had changed and newly available clinical information about people with intellectual disabilities); *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015) (in light of "advances in the scientific literature" concerning cognitive and emotional development, while not overruling *State v. Ha'mim*, 132 Wn.2d 834, 940 P.2d 633 (1997), we concluded that youth is far more likely to diminish a defendant's culpability for sentencing purposes than we had implied in prior cases). In this case, we need not decide whether the prior cases were incorrect and harmful at the time they were decided.

Rather, the scope of article I, section 14, no less than that of the Eighth Amendment, "is not static." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion). Where new, objective information is presented for our consideration, we must account for it. Therefore, Gregory's constitutional claim must be examined in light of the newly available evidence presently before us.

> 3.   *Washington's death penalty is imposed in an arbitrary and racially biased manner*

It is now apparent that Washington's death penalty is administered in an arbitrary and racially biased manner. Given the evidence before us, we strike down Washington's death penalty as unconstitutional under article I, section 14. "Where the trial which results in imposition of the death penalty lacks fundamental fairness, the punishment violates article I, section 14 of the state constitution." *Bartholomew II*, 101 Wn.2d at 640; *see also State v. Manussier*, 129 Wn.2d 652, 676, 921 P.2d 473 (1996) ("the state constitution, like the Eighth Amendment, proscribes disproportionate sentencing in addition to certain modes of punishment").

To reach our conclusion, we afford great weight to Beckett's analysis and conclusions. We refer to Beckett's analysis and conclusions rather than a specific report or model variation filed with this court because there have been numerous updates, corrections, and iterations of her analysis that were conducted since the Updated Beckett Report was first admitted. The State is correct that we cannot explicitly rely on the Updated Beckett Report because of these subsequent changes

in Beckett's data file and analysis. As a result of the State's challenge and Commissioner Pierce's fact-finding process, Beckett's analysis became only more refined, more accurate, and ultimately, more reliable.

After running various models, as requested by Commissioner Pierce, Beckett summarized her findings regarding race:

> [F]rom December 1981 through May of 2014, special sentencing proceedings in Washington State involving Black defendants were between 3.5 and 4.6 times as likely to result in a death sentence as proceedings involving non-Black defendants after the impact of the other variables included in the model has been taken into account.

Resp. to Comm'r's Suppl. Interrogs. at 16 (Sept. 29, 2017). Though the Updated Beckett Report presented three main conclusions concerning the impact of race, county, and case characteristics on the death penalty, *supra* at Section III.B, Gregory's constitutional argument does not refer to the county variance, so we do not consider that conclusion in our analysis. Suppl. Br. of Appellant at 25 ("This new evidence [referring to the Updated Beckett Report] shows the death penalty is imposed in an arbitrary and racially biased manner."). With regard to the methodological issues raised by the State, we find that these concerns have no material negative impact on the weight accorded to Beckett's analysis and conclusions.[7]

---

[7] The State argued that Beckett's analysis was based on too small of a data set because she used maximum likelihood estimate procedures, which generally require at least 100 cases to draw from. To the contrary, we agree with Gregory and amici that the concern is inapplicable because

The most important consideration is whether the evidence shows that race has a meaningful impact on imposition of the death penalty. We make this determination by way of legal analysis, not pure science. *Davis*, 175 Wn.2d at 372, 401 ("We acknowledge that 'we are not statisticians.'" (quoting Wiggins, J., concurring in dissent)). At the very most, there is an 11 percent chance that the observed association between race and the death penalty in Beckett's regression analysis is attributed to random chance rather than true association. Commissioner's Report at 56-68 (the p-values range from 0.048-0.111, which measures the probability that the observed association is the result of random chance rather than a true association).[8]

Beckett conducted an observational study in which her data set includes *all* trial reports filed for defendants who underwent a special sentencing procedure from 1981-2014. The data set reflects the population, not a sample.

Additionally, concerns regarding Beckett's coding protocol and data entry have largely been alleviated by the rigorous review process throughout this litigation. Since the coding and data entry are based on the trial judge's qualitative trial report, there will always be some degree of variance or subjectivity when those reports are translated into numerical values. Gregory highlights the more crucial point—the initial regression analysis in the Updated Beckett Report, the regression analysis conducted in response to Commissioner Pierce's interrogatories, and the final regression analysis conducted pursuant to the updated coding protocol all lead to the *same conclusion*. The subsequent analysis, with corrections, provides even stronger support for the statistical significance of race on the imposition of the death penalty. The State argues that the existence of errors "should give this Court pause." Suppl. Br. of Resp't at 4. Surely we have taken a pause by allowing the State to challenge the Updated Beckett Report and directing Commissioner Pierce to undergo a fact-finding process. We are unpersuaded that the existence of some errors should lead to the conclusion that the rest of the data set is rife with additional errors, especially when professors and social scientist researchers across the field characterize it as a "rigorous and thorough study." Br. of Soc. Scientists & Researchers, at 1.

[8] The most common p-value used for statistical significance is 0.05, but this is not a bright line rule. Commissioner's Report at 57-58. The American Statistical Association (ASA) explains that the "'mechanical "bright-line" rules (such as "p<0.05") for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making.'" *Id.* at 58 (quoting SCURICH, *supra*, at 22) "'A conclusion does not immediately become 'true' on one side of the divide and "false" on the other.'" *Id.* (quoting Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement*

Just as we declined to require "precise uniformity" under our proportionality review, we decline to require indisputably true social science to prove that our death penalty is impermissibly imposed based on race. *Lord*, 117 Wn.2d at 910.

This is consistent with constitutional legal analysis. For example, in *Furman*, Justice Stewart explained that the death sentences before the court were "cruel and unusual in the same way that being struck by lightning is cruel and unusual. . . . [T]he petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." 408 U.S. at 309-10 (Stewart, J., concurring).[9] Justice Stewart did not need to compare the probability of being struck by lightning to the probability of being sentenced to death, nor did he need to rely on an expert's regression analysis to ensure that the petitioners were in fact randomly selected without any relation to other dependent variables. Similarly, Justice White explained what he believed to be "a near truism: that the death penalty could so seldom be imposed that it would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system." *Id.* at 311 (White, J., concurring). He did not need to rely on an expert's calculation as to what point the rate at which the death penalty is imposed becomes low enough that

---

on *p-Values: Context, Process, and Purpose*, 70 AM. STATISTICIAN 129, 131 (2016)), http://dx.doi.org/10.1080/00031305.2016.1154108.

[9] "Since five Justices wrote separately in support of the judgments in *Furman*, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds—Mr. Justice Stewart and Mr. Justice White." *Gregg*, 428 U.S. at 169 n.15.

potential murderers are no longer deterred from committing their intended crimes. Similarly, under the Sixth Amendment to the United States Constitution, ineffective assistance of counsel claimants must show deficient performance and prejudice, where prejudice entails a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* We do not expect the defendant to present statistical evidence of the outcome of hypothetical trials with a more effective attorney and compare it to the original trial, controlling for all other variables. Lastly, in *State v. Santiago*, when deciding that the death penalty was unconstitutional, the Connecticut Supreme Court took judicial notice of scientific and sociological studies that were "'not necessarily indisputably true'" but were "'more likely [true] than not true.'" 318 Conn. 1, 127-29, 122 A.3d 1 (2015) (emphasis omitted) (quoting 2 McCORMICK ON EVIDENCE § 331, at 612-13 (Kenneth S. Broun ed., 7th ed. 2013)).

Given the evidence before this court and our judicial notice of implicit and overt racial bias against black defendants in this state, we are confident that the association between race and the death penalty is *not* attributed to random chance. We need not go on a fishing expedition to find evidence external to Beckett's study as a means of validating the results. Our case law and history of racial discrimination

provide ample support. *See, e.g., City of Seattle v. Erickson,* 188 Wn.2d 721, 734, 398 P.3d 1124 (2017) (peremptory challenge used to strike the only African-American on a jury panel); *State v. Walker,* 182 Wn.2d 463, 488, 341 P.3d 976 (2015) (Gordon McCloud, J., concurring) (describing prosecutor's use of inflammatory, racially charged images "highlighting the defendant's race—his blackness—in a case where that had absolutely no relevance"); *In re Pers. Restraint of Gentry,* 179 Wn.2d 614, 632, 316 P.3d 1020 (2014) (prosecutor heckled black defense attorney in a death-penalty trial, asking, "'Where did you learn your ethics? In Harlem?'"); *State v. Saintcalle,* 178 Wn.2d 34, 45, 309 P.3d 326 (2013) (plurality opinion) ("'[T]he fact of racial and ethnic disproportionality in [Washington's] criminal justice system is indisputable.'" (second alteration in original) (quoting TASK FORCE ON RACE & CRIMINAL JUSTICE SYS., PRELIMINARY REPORT ON RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM 1 (2011), https://law.seattleu. edu/Documents/Korematsu/Defender%20Initiative/2014DefenderConference/2pm %20panel/preliminary_report_race_criminal_justice_030111.pdf) [https://perma.cc/6BV4-RBB8]); *State v. Monday,* 171 Wn.2d 667, 676-79, 257 P.3d 551 (2011) (reversing a case in which the prosecutor argued to the jury that "'black folk don't testify against black folk'" and referred to the police as "'po-leese'" in the examination of black witness); *State v. Rhone,* 168 Wn.2d 645, 648, 229 P.3d 752 (2010) (plurality opinion) (peremptory challenge used to strike the

"only African-American venire member in a trial of an African-American defendant"); *State v. Dhaliwal*, 150 Wn.2d 559, 582, 79 P.3d 432 (2003) (Chambers, J., concurring) (the prosecution's theory of the case relied on "impermissible stereotypes of the Sikh religious community"); *Turner v. Stime*, 153 Wn. App. 581, 594, 222 P.3d 1243 (2009) (requiring new trial based on jurors' racist remarks regarding Japanese-American attorney); OFFICE OF ATTY. GEN. OF WASH. STATE, CONSOLIDATING TRAFFIC-BASED FINANCIAL OBLIGATIONS IN WASHINGTON STATE 9 (Dec. 1, 2017), https://app.leg.wa.gov/ReportsToTheLegislature/Home/GetPDF?fileName=SB%206360%20Report_12-01-7_0c338f90-d3b6-46e2-a87d-387eba9a0b46.pdf [https://perma.cc/TB4K-KAEF]; *see also* Amici Curiae Br. of 56 Former & Retired Wash. State Judges et al. at 8-13.

The arbitrary and race based imposition of the death penalty cannot withstand the "'evolving standards of decency that mark the progress of a maturing society.'" *Fain*, 94 Wn.2d at 397 (quoting *Trop*, 356 U.S. at 101). When considering a challenge under article I, section 14, we look to contemporary standards and experience in other states. *State v. Campbell*, 103 Wn.2d 1, 32, 691 P.2d 929 (1984). We recognize local, national, and international trends that disfavor capital punishment more broadly.[10] When the death penalty is imposed in an arbitrary and

---

[10] Governor Jay Inslee issued a moratorium on capital punishment in 2014. He explained that "[t]he use of the death penalty in this state is unequally applied . . . . There are too many flaws in the system. And when the ultimate decision is death there is too much at stake to accept an

25

racially biased manner, society's standards of decency are even more offended. Our capital punishment law lacks "fundamental fairness" and thus violates article I, section 14. *Bartholomew II*, 101 Wn.2d at 640.

> 4.    *The death penalty, as administered, fails to serve legitimate penological goals*

Given our conclusion that the death penalty is imposed in an arbitrary and racially biased manner, it logically follows that the death penalty fails to serve penological goals. The principal purposes of capital punishment are "retribution and deterrence of capital crimes by prospective offenders." *Gregg*, 428 U.S. at 183; *State v. Kwan Fai Mak*, 105 Wn.2d 692, 755 n.124, 718 P.2d 407 (1986) (quoting the same passage). Unless the death penalty "measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." *Enmund v. Florida*, 458

---

imperfect system. . . . When the majority of death penalty sentences lead to reversal, the entire system itself must be called into question." Governor Jay Inslee Remarks Announcing a Capital Punishment Moratorium (Feb. 11, 2014), https://www.governor.wa.gov/sites/default/files /documents/20140211_death_penalty_moratorium.pdf [https://perma.cc/U6VX-9FVH]. While a majority of states have capital punishment laws, the annual number of new death sentences has steadily decreased over the last 20 years, from 315 in 1996 to 39 in 2017. DEATH PENALTY INFO. CTR., THE DEATH PENALTY IN 2017: YEAR END REPORT 1 (Jan. 3, 2018), https://deathpenaltyinfo.org/documents/2017YrEnd.pdf [https://perma.cc/YGV4-XLHV]. Nine states have abolished the death penalty since *Gregg*, and three other governors issued moratoria. Suppl. Br. of Appellant at 31 (citing *States with and without the Death Penalty as of November 9, 2016*, DEATH PENALTY INFO. CTR., https://www.deathpenaltyinfo.org/states-and-without-death-penalty) [https://perma.cc/8DT6-H7DG]). Internationally, dozens of countries have abolished capital punishment, including all European Union nations. *Id.* (citing *Abolitionist and Retentionist Countries*, DEATH PENALTY INFO. CTR., https://deathpenaltyinfo.org/abolitionist-and-retentionist-countries [https://perma.cc/V3BE-9JQS]).

U.S. 782, 798, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982) (quoting *Coker v. Georgia*, 433 U.S. 584, 592, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977)). "If the policy of this state is retribution for capital crimes, then it must be evenhanded." *Campbell*, 103 Wn.2d at 48 (Utter, J., concurring in part, dissenting in part).

In *Davis,* this court was unable to address the defendant's state constitutional claim that the death penalty failed to serve the legislative goal of deterrence because of a "severe lack of information on the death penalty's implementation." 175 Wn.2d at 345. Now the information is plainly before us. Beckett's analysis and conclusions demonstrate that there is "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman*, 408 U.S. at 313 (White, J., concurring). To the extent that race distinguishes the cases, it is clearly impermissible and unconstitutional.

Our capital punishment law was intended to fix the problems identified in *Furman*, but after decades of experience, we now see the same fatal flaws emerge, despite the legislative attempt to avoid such deficiencies. Yet, the death penalty is not per se unconstitutional. *Campbell*, 103 Wn.2d at 31 ("the death penalty is not per se unconstitutional, since both the federal and state constitutions recognized capital punishment at the time of their adoption"). We leave open the possibility that the legislature may enact a "carefully drafted statute," *Gregg*, 428 U.S. at 195, to impose capital punishment in this state, but it cannot create a system that offends

constitutional rights. "[T]he death penalty is constitutional only if it is properly constrained to avoid freakish and wanton application." *Cross*, 156 Wn.2d at 622-23. The United States Supreme Court was "unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano v. Florida*, 468 U.S. 447, 464, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984), *overruled on other grounds Hurst v. Florida*, __ U.S. __, 136 S. Ct 616, 193 L. Ed. 2d 504 (2016). We agree. "[T]o hold that the death penalty is per se unconstitutional would be to substitute our moral judgment for that of the people of Washington." *State v. Rupe*, 101 Wn.2d 664, 698, 683 P.2d 571 (1984) (plurality opinion).

5. *Proportionality review fails to alleviate the constitutional defects in our capital punishment law, but it cannot be severed*

Imposing the death penalty in an arbitrary and racially biased manner cannot be alleviated through this court's statutory proportionality review. RCW 10.95.130(2)(b). Proportionality review serves as a safeguard against arbitrary sentencing, but it is conducted on an individual basis for each death sentence. "At its heart, proportionality review will always be a subjective judgment as to whether *a particular death sentence* fairly represents the values inherent in Washington's sentencing scheme for aggravated murder." *Pirtle*, 127 Wn.2d at 687 (emphasis added). It does not address our capital punishment law as a whole. Notwithstanding the broad goals of proportionality review, case-by-case review of death sentences cannot fix the constitutional deficiencies before us.

28

Despite this shortcoming, proportionality review cannot be severed. Our capital punishment law contains a severability clause, LAWS OF 1981, ch. 138, § 22, but such clauses are "'not an inexorable command'." *Hall v. Niemer*, 97 Wn.2d 574, 584, 649 P.2d 98 (1982) (quoting *Dorchy v. Kansas*, 264 U.S. 286, 290, 44 S. Ct. 323, 68 L. Ed. 686 (1924)); *McGowan v. State*, 148 Wn.2d 278, 295, 60 P.3d 67 (2002) (severability clauses are "not necessarily dispositive"). The test for severability is

> "whether the constitutional and unconstitutional provisions are so connected . . . that it could not be believed that the legislature would have passed one without the other; or where the part eliminated is so intimately connected with the balance of the act as to make it useless to accomplish the purposes of the legislature."

*Hall*, 97 Wn.2d at 582 (alteration in original) (quoting *State ex rel. King County v. State Tax Comm'n*, 174 Wash. 336, 339-40, 24 P.2d 1094 (1933)). The disputed provision "must be grammatically, functionally, and volitionally severable." *McGowan*, 148 Wn.2d at 295.

At the time of enactment, the legislature likely assumed that a constitutional death penalty statute required proportionality review (a component of death sentence review) because the Georgia death penalty statute upheld in *Gregg* contained a mandatory proportionality review. 428 U.S. at 206. The United States Supreme Court later held that proportionality review is not required under the federal constitution, *Pulley*, 465 U.S. at 43-44, but the provisions remain intimately

29

connected. *Lord*, 117 Wn.2d at 908. This court has not opined on whether proportionality review is required under our state constitution. Regardless, proportionality review cannot be functionally severed because there is no authority to carry out capital punishment without proportionality review. *See Dodd*, 120 Wn.2d at 14 ("[T]his court must review a sentence of death, regardless of a defendant's wishes."). The trial court cannot issue a death warrant to order execution until our court affirms the death sentence and remands the case back to the trial court. RCW 10.95.160(1). The execution date is then dependent on the date of remand. *Id.* Proportionality review does not guarantee the constitutionality of the death penalty, but it is so intimately and functionally connected to the capital punishment law that it cannot be severed.

D.      Review of arguments pertaining to the guilt phase of Gregory's trial is precluded

This case is an appeal of Gregory's death sentence, combined with our statutorily mandated death sentence review. Gregory's first degree murder conviction has already been appealed, reviewed by this court, and affirmed. *Gregory I*, 158 Wn.2d at 777-78. Despite this, Gregory continues to raise arguments pertaining to his conviction.

1.  *We decline to review Gregory's arguments concerning the admissibility of evidence used at trial or the denied motion for a new trial*

Gregory argues that the trial court should have suppressed certain key evidence used at trial (blood samples, DNA, a knife) and should have granted his motion for a new trial. In Gregory's first appeal before this court, we upheld the validity of the blood samples and DNA evidence but reversed his rape conviction on other grounds and remanded the case for resentencing. *Gregory* I, 158 Wn.2d at 828-29, 867. In June 2011, following remand, Gregory brought a pretrial motion that again challenged the admissibility of the DNA evidence. Gregory moved to dismiss his death penalty proceeding and to order a new guilt phase trial. Gregory also moved to suppress evidence used to obtain his first degree murder conviction or, in the alternative, to order a *Franks*[11] hearing to determine the State's knowledge regarding potentially exculpatory evidence used as a basis to find probable cause for the warrant and orders in question. Gregory argued that despite our holding in *Gregory* I, law of the case did not bar his challenge. He also argued that the State had in its control *Brady*[12] information concerning R.S. that evidenced its lack of probable cause to prosecute Gregory for rape. The trial court ruled the information regarding R.S. was not *Brady* material and was not withheld by the prosecution. Regarding the DNA and blood samples, the trial court denied Gregory's motions because this court

---

[11]*Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).
[12]*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

had "thoroughly analyzed and decided" those issues in *Gregory* I. 5 Verbatim Report

of Proceedings (June 24, 2011) (VRP) at 284. Gregory filed a motion to reconsider,

but the trial court denied the motion.

Gregory now attempts to reassert many of the same arguments from his first

appeal. He claims the State withheld relevant information about R.S. when obtaining

the orders to procure a sample of his DNA and a warrant to search his vehicle where

the knife was found. Specifically, he asserts that the trial court would not have

authorized the warrant or the orders if it was aware that R.S. had a history as a paid

confidential informant. We decline to address this argument because reconsideration

is barred by law of the case doctrine. Alternatively, review is not warranted under

RAP 2.5, nor has Gregory shown grounds for overruling our precedent.[13]

---

[13] Normally, the trial court's rulings would be reviewed under abuse of discretion. A new trial is necessary only when the defendant "'has been so prejudiced that nothing short of a new trial can insure that the defendant will be treated fairly.'" *State v. Hager*, 171 Wn.2d 151, 156, 248 P.3d 512 (2011) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997)). The decision to grant or deny a new trial is primarily within the discretion of the trial court, and we will not disturb that decision absent a clear abuse of discretion. *Id.* Similarly, we grant the trial court wide discretion in granting or denying dismissals for discovery violations, and we will not disturb that decision absent a manifest abuse of discretion. *State v. Woods*, 143 Wn.2d 561, 582, 23 P.3d 1046 (2001) (citing *State v. Hanna*, 123 Wn.2d 704, 715, 871 P.2d 135 (1994)). Manifest abuse of discretion requires a finding that no reasonable judge would have ruled the way the trial court did. *State v. Mason*, 160 Wn.2d 910, 933-34, 162 P.3d 396 (2007). On appeal, the defendant bears the burden of demonstrating that the trial court's refusal was an abuse of discretion. *State v. Robinson*, 38 Wn. App. 871, 881, 691 P.2d 213 (1984). Gregory fails to show that the trial court abused its discretion, let alone that it manifestly or clearly abused its discretion. *See Hager*, 171 Wn.2d at 156; *Woods*, 143 Wn.2d at 582.

a.  *Law of the case doctrine bars review*

When we have already determined a legal issue in a prior appeal, the law of the case doctrine typically precludes us from redeciding the same legal issue on a subsequent appeal. *State v. Clark*, 143 Wn.2d 731, 745, 24 P.3d 1006 (2001). "'[Q]uestions determined on appeal, or which might have been determined had they been presented, will not again be considered on a subsequent appeal if there is no substantial change in the evidence at a second determination of the cause.'" *Folsom v. County of Spokane*, 111 Wn.2d 256, 263, 759 P.2d 1196 (1988) (quoting *Adamson v. Traylor*, 66 Wn.2d 338, 339, 402 P.2d 499 (1965)). We will reconsider a subsequent appellate argument raising the identical legal issue only when the holding of the prior appeal is clearly erroneous and the application of the law of the case doctrine will result in a manifest injustice. *Clark*, 143 Wn.2d at 745.

The primary justification Gregory asserts for revisiting this issue is the information surrounding R.S.'s history as a confidential informant. However, the trial court found that this information was either known or made available to Gregory's attorney prior to the first trial. Gregory does not challenge this finding on appeal. Thus, Gregory failed to timely raise the issue in the trial court either prior to or during his first appeal. *See State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84 (2011) (explaining that the general rule is that a failure to raise an issue before the trial court constitutes a waiver, unless the party can show a manifest error affecting

33

a constitutional right); *see also* RAP 2.5(a). The decision regarding the propriety of the warrant and orders to obtain physical evidence are therefore law of the case and not subject to review. Law of the case also precludes consideration of the *Franks* issue and the probable cause required to obtain the search warrant and blood draw orders. *Clark*, 143 Wn.2d at 745 (law of the case bars new arguments attacking the factual basis of our holding in the first appeal when the issue could have been determined had it been presented). Moreover, Gregory presents no new evidence that would merit authoritatively overruling *Gregory* I. *See id.*

      b.    *Review is not warranted under RAP 2.5(c)(1)*

In an attempt to overcome law of the case doctrine, Gregory argues that review is warranted under RAP 2.5(c)(1) because he raised new grounds in his 2011 motion to the trial court, other than those considered in *Gregory* I. RAP 2.5(c) provides:

> **Law of the Case Doctrine Restricted.** The following provisions apply if the same case is again before the appellate court following a remand:
>     (1) *Prior Trial Court Action*. If a trial court decision is otherwise properly before the appellate court, the appellate court may at the instance of a party review and determine the propriety of a decision of the trial court even though a similar decision was not disputed in an earlier review of the same case.

"This rule does not revive automatically every issue or decision which was not raised in an earlier appeal." *State v. Barberio*, 121 Wn.2d 48, 50, 846 P.2d 519 (1993). An issue that could have been appealed in an earlier proceeding is reviewable under RAP 2.5(c)(1) in a later appeal following remand of the case *only* if the trial court,

34

on remand and in the exercise of its own independent judgment, considered and ruled

again on that issue. *Id.*

When the trial court ruled on the 2011 motions, the court considered

Gregory's argument regarding the history of R.S. and how that may have impacted

the validity of the warrant request and blood draw orders. The trial court found that

the purported "new" evidence was made available to Gregory before the first trial.

VRP at 283. The trial court explained that it was constrained by our analysis

surrounding the same evidence in *Gregory* I and, thus, it did not exercise its

"independent judgment" by ruling again on that issue as RAP 2.5(c)(1) requires. *See*

*Barberio*, 121 Wn.2d at 50. Gregory fails to make the requisite showing under RAP

2.5(c)(1) to warrant review.

> c.     *Review is not warranted under RAP 2.5(c)(2)*

Gregory argues that intervening changes in the law compel our review of the

blood draw orders under RAP 2.5(c)(2). RAP 2.5(c) states:

> **Law of the Case Doctrine Restricted.** The following provisions apply
> if the same case is again before the appellate court following a remand:
>
> . . . .
>
> (2) *Prior Appellate Court Decision.* The appellate court may at
> the instance of a party review the propriety of an earlier decision of the
> appellate court in the same case and, where justice would best be
> served, decide the case on the basis of the appellate court's opinion of
> the law at the time of the later review.

This rule "allow[s] a prior appellate holding in the same case to be reconsidered

where there has been an intervening change in the law." *State v. Schwab*, 163 Wn.2d

664, 673, 185 P.3d 1151 (2008) (citing *Roberson v. Perez*, 156 Wn.2d 33, 42, 123 P.3d 844 (2005)). If there has been an intervening change in the law, we will consider whether "'corresponding injustice would result to the other party if the erroneous decision should be set aside.'" *Folsom*, 111 Wn.2d at 264 (quoting *Greene v. Rothschild*, 68 Wn.2d 1, 10, 402 P.2d 356, 414 P.2d 1013 (1965)).

Gregory relies on four different opinions, but none of them establish an intervening change in the law to warrant reconsideration of *Gregory* I. In *State v. Figeroa Martines*, we held that the State's warrant authorized the extraction of the defendant's blood sample, which indicated that probable cause existed to believe the blood contained evidence of driving under the influence (DUI). 184 Wn.2d 83, 93, 355 P.3d 1111 (2015). Gregory relied on the Court of Appeals' opinion in that case because he submitted his reply brief prior to our decision *reversing* the Court of Appeals. Gregory also argues that *State v. Garcia-Salgado* constitutes an intervening change in the law because it clarified the standards for biological samples under CrR 4.7. 170 Wn.2d 176, 240 P.3d 153 (2010). In that case, we held that a cheek swab for DNA constitutes a search and therefore requires a warrant or a warrant exception in order to be permissible. *Id.* at 184. Though we considered the requirements under CrR 4.7, this did not render our decision in *Gregory* I erroneous in any way, especially when we cited to *Gregory* I for the proposition that the blood draw orders were constitutionally valid. *Id.* at 186; *see Folsom*, 111 Wn.2d at 264.

36

Gregory next relies on *State v. Winterstein*, 167 Wn.2d 620, 220 P.3d 1226 (2009). In that case, we held that there is no inevitable discovery exception[14] under article I, section 7 because "it is incompatible with the nearly categorical exclusionary rule under article I, section 7." *Id.* at 636. Gregory argues that we relied on the inevitable discovery doctrine to uphold the constitutionality of his 1998 blood draw. While we did cite to an inevitable discovery case in *Gregory* I, we declined to examine the validity of the 1998 blood draw, so no such reliance was placed on the doctrine. 158 Wn.2d at 825. Instead, we upheld the validity of the 2000 blood draw without the inevitable discovery citation. Lastly, Gregory relies on *Missouri v. McNeely*, which held that there is no per se exigency exception for taking blood samples following a DUI arrest. 569 U.S. 141, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013). He maintains that *McNeely* recognized an increased privacy in a suspect's blood, but this is nothing new. We have already recognized this proposition much in advance of *Gregory* I. *See, e.g., State v. Olivas*, 122 Wn.2d 73, 93, 856 P.2d 1076 (1993). These cases do not evidence changes in the law necessitating our reconsideration of *Gregory* I. Gregory also attempts to use RAP 2.5(a)(3) to seek

---

[14]"[T]he federal [inevitable discovery] doctrine allows admission of illegally obtained evidence if the State can 'establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *Winterstein*, 167 Wn.2d at 634 (quoting *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)).

review; however, he relies on the same cases discussed here, so the argument is subject to the same defects.[15]

        d.     Cheatam *remains good law*

Gregory argues that we should reconsider our ruling in *State v. Cheatam*, 150 Wn.2d 626, 81 P.3d 830 (2003), which we relied on in *Gregory* I to uphold the constitutionality of the comparative DNA testing between the DNA from his rape case and the DNA found on G.H. In *Gregory* I, we held "that once a suspect's property is lawfully in the State's control, the State may perform forensic tests and use the resulting information to further unrelated criminal investigations, without violating the owner's Fourth Amendment rights" or article I, section 7. 158 Wn.2d at 826 (emphasis omitted) (citing *Cheatam*, 150 Wn.2d at 638).

Before we reconsider an established rule of law that is otherwise entitled to stare decisis, there must be a clear showing that the rule is incorrect and harmful. *State v. Barber*, 170 Wn.2d 854, 863, 248 P.3d 494 (2011) (citing *In re Rights to Waters of Stranger Creek*, 77 Wn.2d at 653). Gregory fails to make this showing. He relies on authority from other jurisdictions that is clearly distinguishable. Opening Br. of Appellant at 181-82 (citing *State v. Gerace*, 210 Ga. App. 874, 437 S.E.2d 862 (1993); *State v. Binner*, 131 Or. App. 677, 886 P.2d 1056 (1994)). "We

---

[15] RAP 2.5(a)(3) provides that "[t]he appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: . . . manifest error affecting a constitutional right."

are not inclined to abandon our own directly binding precedent in favor of distinguishable, nonbinding authority." *Davis*, 175 Wn.2d at 337. And he fails to show that *Cheatam* is harmful, aside from the fact that it is detrimental to his own case. We may consider a decision "harmful" for any number of reasons, but the "common thread" is the "decision's detrimental impact on the public interest." *Barber*, 170 Wn.2d at 865.

2. *Law of the case doctrine bars review of challenges already rejected in* Gregory *I*

Lastly, Gregory raises several federal constitutional challenges[16] that were rejected in his first appeal. Opening Br. of Appellant at 278; *Gregory* I, 158 Wn.2d

---

[16] Specifically, Gregory asks us to reconsider the following:

a. The trial court improperly excused prospective Juror No. 1 in violation of *Witherspoon v. Illinois*[, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968)], *Wainwright v. Witt*[, 469 U.S. 412. 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)], *Morgan v. Illinois*[, 504 U.S. 719, 112 S. Ct. 2222, 19 L. Ed. 2d 492 (1992)], [and] the Eighth and Fourteenth Amendments.

b. There was insufficient evidence of premeditation to support a conviction under the Fourteenth Amendment and *Jackson v. Virginia*[, 443 U.S. 307, 99 S. Ct. 628, 61 L. Ed. 2d 560 (1970)].

c. The State's introduction of evidence that Mr. Gregory declined to be tape recorded during an interrogation and his failure to contact Det. [David] DeVault after DeVault left a message for his grandmother violated Mr. Gregory's right to remain silent and due process of law, protected by the Fifth and Fourteenth Amendments.

d. The trial court's exclusion of Mr. Gregory's aunt from the courtroom violated the right of an open and public trial protected by the First, Sixth and Fourteenth Amendments.

e. Prosecutorial misconduct in closing argument—improperly shifting the burden of proof regarding Mike Barth; denigrating defense counsel's cross-

39

at 813-18, 838-46. Gregory concedes that we addressed and rejected these arguments in his first appeal but nonetheless argues that we should reconsider these issues under RAP 2.5(c)(2). As explained in Section III.D.1.c, *supra*, RAP 2.5(c)(2) restricts the law of the case doctrine by providing us the discretion to reconsider issues from a prior appeal when there has been an intervening change in the law and "justice would best be served" by our reconsideration. *Schwab*, 163 Wn.2d at 673, 668 (citing *Roberson v. Perez*, 156 Wn.2d 33, 42, 123 P.3d 844 (2005)). Gregory failed to assert any intervening changes in the law or mistakes in the record that would render our rulings in *Gregory* I erroneous. We decline to exercise our discretion to revisit these issues.

## IV. CONCLUSION

Under article I, section 14, we hold that Washington's death penalty is unconstitutional, as administered, because it is imposed in an arbitrary and racially biased manner. Given the manner in which it is imposed, the death penalty also fails to serve any legitimate penological goals. Pursuant to RCW 10.95.090, "if the death

---

examination of John Brown; commenting on Mr. Gregory's right to remain silent for not returning Det. DeVault's calls; and by arguing facts not in evidence and misstating the facts regarding the DNA evidence—deprived Mr. Gregory of due process protected by the Fourteenth Amendment.

f.      Cumulative error at the guilt phase violated Mr. Gregory's rights under the Eighth and Fourteenth Amendments.

Opening Br. of Appellant at 278-79 (some citations omitted).

penalty established by this chapter is held to be invalid by a final judgment of a court which is binding on all courts in the state, the sentence for aggravated first degree murder . . . shall be life imprisonment." All death sentences are hereby converted to life imprisonment.

We decline to reconsider Gregory's arguments pertaining to the guilt phase of his trial. His conviction for aggravated first degree murder has already been appealed and affirmed by this court.

Fairhurst, C.J.

WE CONCUR:

Wiggins, J.

González, J.
in result only

Gordon McCloud, J.

Yu, J.

42

*State v. Gregory (Allen Eugene)*

No. 88086-7

JOHNSON, J. (concurring)—While I generally concur with the majority's

conclusions and its holding invalidating the death penalty, additional state

constitutional principles compel this result. While the conclusions contained in the

Beckett report[1] disclosing racial bias in the overall administration of capital

punishment raise significant concerns, other additional constitutional factors have

become more apparent, supporting the conclusion that the death penalty, as

administered, is unconstitutional.

Article I, section 14[2] of our state constitution is the counterpart to the Eighth

Amendment[3] to the United States Constitution. We have recognized, in limited

situations, that this provision may provide greater constitutional protections than

---

[1] KATHERINE BECKETT & HEATHER EVANS, THE ROLE OF RACE IN WASHINGTON STATE CAPITAL SENTENCING, 1981-2014 (Oct. 13, 2014) [https://perma.cc/XPS2-74TR].

[2] "**EXCESSIVE BAIL, FINES AND PUNISHMENTS.** Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted."

[3] "**BAILS, FINES, AND PUNISHMENTS.** Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

established under the Eighth Amendment. It is unnecessary to explore whether greater protections exist in this situation because, at the very least, our state constitution cannot provide for fewer protections than exist under the Eighth Amendment. What that means is that article I, section 14, at a minimum, embraces the same principles and concerns existing under the Eighth Amendment and, importantly, the same standard of review.

In *State v. Cross*, 156 Wn.2d 580, 132 P.3d 80 (2006), and *State v. Davis*, 175 Wn.2d 287, 290 P.3d 43 (2012), constitutional concerns were voiced in the dissenting opinions that centered on the randomness, unpredictability, and arbitrariness of the statewide administration of the death penalty system. Since the time those cases were decided, experience shows that the systemic constitutional concerns have deepened and continued moving toward increased rarity, randomness, arbitrariness, and overall statewide abandonment.

Based on a current review of the administration and processing of capital cases in this state, what is proved is obvious. A death sentence has become more randomly and arbitrarily sought and imposed, and fraught with uncertainty and unreliability, and it fails state constitutional examination.

Before analyzing the experiences evident in the administration of capital sentencing in this state, it is necessary to establish the required constitutional

2

standard of review. Constitutional analysis is determined de novo. Conducting a constitutional interpretation, as is done in death penalty cases, is slightly different than more traditional constitutional review. As explained more specifically, constitutional analysis in death penalty review requires a broad, comparative approach. What this means is that we engage in a systemic view through a broader lens. In death penalty cases, while our statutory proportionality review includes a comparability component, the statutory focus is more case specific as it relates to the defendant, his or her crime, and case specific circumstances, and under the statute it directs us to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."[4]

Importantly, under constitutional comparative review, the analysis incorporates an inspection of the entire system of capital sentencing to ensure constitutional requirements are satisfied. Cases from the United States Supreme Court not only establish the required constitutional review but also identify those minimum Eighth Amendment principles that must be satisfied. As noted previously, article I, section 14 can provide no less protection.

---

[4] RCW 10.95.130(2)(b).

Reviewing some of the United States Supreme Court Eighth Amendment cases is helpful in emphasizing constitutional requirements. To begin, the Eighth Amendment case most often cited as establishing a "comparability analysis," i.e., reviewing a specific sentence and comparing that sentence with sentences imposed in other cases, is *Weems v. United States*, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910). In that case, the Court invalidated a sentence by essentially holding that the sentence so far exceeded what the Court found was proportionate for the crime, and compared the sentence in that case with those imposed in other situations. We have embraced similar reasoning under article I, section 14. *See State v. Fain*, 94 Wn.2d 387, 400, 617 P.2d 720 (1980). This comparability principle continues to guide United States Supreme Court Eighth Amendment review in death penalty and other sentencing situations.

An important aspect of Eighth Amendment comparative constitutional review requires this systemic-type analysis. *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion), is often cited as establishing the principle that "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." What this means is that in conducting any constitutional analysis, the inquiry takes into consideration what is actually and currently taking place in the administration of

the entire system—a much broader view than just the facts and circumstances of the case on review. What the Court looks to, in part, can be characterized as the "frequency" a death sentence or other sentences are sought or imposed in specific circumstances. This inquiry plays a significant role in determining the "evolving standards of decency" principle.

A brief review of how the United States Supreme Court cases have evolved best evidences this standard of review and the factors the Court has identified in its decisions.

In *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality opinion), the Court, in affirming a death sentence, upheld a reenacted state statute that authorized capital punishment for six categories of crime: murder, kidnapping for ransom where the victim is harmed, armed robbery, rape, treason, and aircraft hijacking. The statute at issue also provided for an appellate inquiry on "'[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.'" *Gregg*, 428 U.S. at 167 (quoting former GA. CODE ANN. § 27-2537(c)(3) (1973)). While the Court upheld the statute and found that the penalty of death was not unconstitutional in all cases, it cited favorably to the principles established in *Trop*. *Gregg*, 428 U.S. at 173. The Court in *Gregg* found the statute sufficiently

narrowed the type of death penalty eligible crimes, added objectiveness to guide

and narrow the fact finder's decision, and contained sufficient other procedural

safeguards to survive constitutional scrutiny.

Since *Gregg* was decided, the United States Supreme Court, in a steady

progression of cases, has narrowed its holding and limited the permissible

constitutional authority of states to seek the death penalty for specific crimes and

for specific defendants. An extensive review is unnecessary; however, several

cases highlight the reasoning and constitutional requirements.

In *Godfrey v. Georgia*, 446 U.S. 420, 100 S. Ct 1759, 64 L. Ed. 2d 398

(1980), the United States Supreme Court reversed a death penalty. In doing so, the

Court, quoting *Furman*,[5] stated, "[T]he penalty of death may not be imposed under

sentencing procedures that create a substantial risk that the punishment will be

inflicted in an arbitrary and capricious manner. *Gregg v. Georgia, supra,*

reaffirmed this holding." *Godfrey*, 446 U.S. at 427. "A capital sentencing scheme

must, in short, provide a "'meaningful basis for distinguishing the few cases in

which [the penalty] is imposed from the many cases in which it is not.'"" *Godfrey*,

---

[5] *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

446 U.S. at 427 (alteration in original) (quoting *Gregg*, 428 U.S. at 188 (quoting

*Furman*, 408 U.S. at 313 (White, J., concurring))).

In *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140

(1982), the United States Supreme Court invalidated state statutes authorizing the

death penalty for defendants who aided and abetted a felony where a murder is

committed by others and where the defendant does not kill or intend that a killing

occur. Key to the Court's analysis was the determination that, nationally, few states

authorized the death penalty under these circumstances, which under its view,

reflected society's rejection of the death penalty for accomplice liability in felony

murders. The Court observed:

> In *Gregg v. Georgia* the [Supreme Court] observed that "[t]he
> death penalty is said to serve two principal social purposes: retribution
> and deterrence of capital crimes by prospective offenders." 428 U. S.,
> at 183 (footnote omitted). Unless the death penalty [in a specific case]
> measurably contributes to one or both of these goals, it "is nothing
> more than the purposeless and needless imposition of pain and
> suffering," and hence an unconstitutional punishment. *Coker v.
> Georgia*, [433 U.S. 584, 592, 97 S. Ct. 2861, 53 L. Ed. 2d 982
> (1977)].

*Enmund*, 458 U.S. at 798 (second alteration in original).

The United States Supreme Court's constitutional concerns continued to

evolve and incorporate this type of inquiry, looking not only to "frequency" among

the states' practices but also to identifiable trends.

In *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335

(2002), the Court invalidated the death penalty for mentally retarded criminals.

Significant to its holding was a statistical-type analysis that looked at not only the

number of states (and Congress) that prohibited the execution of mentally retarded

offenders but also the trend among the states. The Court reasoned, "It is not so

much the number of these States that is significant, but the consistency of the

direction of change." *Atkins*, 536 U.S. at 315. The Court also expressed its view

that

> [o]ur independent evaluation of the issue reveals no reason to
> disagree with the judgment of "the legislatures that have recently
> addressed the matter" and concluded that death is not a suitable
> punishment for a mentally retarded criminal. We are not persuaded
> that the execution of mentally retarded criminals will measurably
> advance the deterrent or the retributive purpose of the death penalty.

*Atkins*, 536 U.S. at 321. This concern surfaces in later cases.

In *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005),

the Court invalidated the death penalty for juveniles under age 18, overruling its

previous ruling in *Stanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed.

2d 306 (1989). In doing so, the Court relied not only on the analysis employed in

*Atkins* in determining a national consensus and the consistency of the direction of

change but also on a growing awareness of a lack of maturity for juveniles. The

Court reasoned that this factor resulted in a diminished culpability of juveniles,

which undermined the penological justifications of """"retribution and deterrence of

capital crimes by prospective offenders."""" *Roper*, 543 U.S. at 571 (quoting *Atkins*,

536 U.S. at 319 (quoting *Gregg*, 428 U.S. at 183)).

Similar reasoning had supported the Supreme Court's invalidation of the

death penalty for rape of an adult woman, *Coker v. Georgia*, 433 U.S. 584, and,

later, for aggravated rape of a child, *Kennedy v. Louisiana*, 554 U.S. 407, 128 S.

Ct. 2641, 171 L. Ed. 2d 525 (2008).

More recently, in analyzing mandatory life without possibility of parole

sentences for juvenile offenders, the United States Supreme Court declared

unconstitutional any such mandatory sentencing scheme for juveniles. In *Graham*

*v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), the Court

analyzed the "evolving standards of decency" factor and found that although many

state statutes authorized a *life without parole* sentence for juveniles convicted of

nonhomicide crimes, since statistical surveys showed few states actually imposed

such mandatory sentences, those statutes were unconstitutional. In *Miller v.*

*Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), the Court,

applying much of the analysis from *Graham*, invalidated sentencing statutes

requiring a life without parole sentence for certain juvenile homicide convictions.

The lessons these cases teach us is that review of the constitutionality of the death penalty system must analyze the issue in contemporary terms and practices, and the constitutional analysis, at a minimum, must include a systemic determination of randomness, consensus, arbitrariness, frequency, reliability, trends, and penological justifications.

As indicated earlier, the United States Supreme Court cases interpreting the Eighth Amendment guide our state constitutional analysis and cannot be disregarded. Analysis under article I, section 14 must, at a minimum, proceed and apply those same principles. A significant difference when analyzing our state constitution is that we are not constrained by those principles of federalism that limit and guide United States Supreme Court analysis, where the Court considers national trends and practices. An analysis under article I, section 14 focuses on practices, trends, and experiences within our state.

### Frequency, Arbitrariness, and Randomness

In order to conduct the article I, section 14 analysis under a similar analytical framework as employed by the United States Supreme Court, it is necessary to review what we know about the administration of our state capital sentencing system.

*State v. Gregory (Allen Eugene)*, No. 88086-7
(Johnson, J., concurring)

As referenced earlier in *Cross*, the dissent raised the concerns in

constitutional terms over random, arbitrary, or capricious imposition of a death

sentence emphasized in *Furman* and *Cross*. In addition to what was analyzed in

that opinion, it is important to review what our state's experiences reflected at that

time.

Shortly after *Cross* was decided, the Washington State Bar Association

issued a final report of the death penalty subcommittee. *See* WASH. STATE BAR

ASS'N, FINAL REPORT OF THE DEATH PENALTY SUBCOMMITTEE OF THE COMMITTEE

ON PUBLIC DEFENSE (Dec. 2006)[6] (Final Report). Our current death penalty statute

was enacted in 1981. As of 2006, the report discloses that a total of 254 death

eligible aggravated murder cases were charged arising in 25 counties. The report

observes the "data shows that most of the death penalty cases occur in a small

number of counties. . . . Thus, death penalty cases have been brought in 17 of the

39 counties during the last 25 years and the death sentence has been imposed in 10

of those counties." Final Report at 12. A total of 30 death sentences were imposed

from the 10 counties.

---

[6] https://www.wsba.org/docs/default-source/legal-community/committees/council-on-
public-defense/death-penalty-report.pdf?sfvrsn=120301f1_14 [https://perma.cc/S6C2-MUJK].

The report continues, revealing that of the 30 death sentence cases, 19 were reversed on appellate review and "nearly all have resulted in a sentence of life without the possibility of parole." Final Report at 8. Death sentences, including executions, at that time had arisen in 8 counties out of the 25 counties where death eligible crimes were charged.

In *Davis*, 175 Wn.2d 287, then Justice Fairhurst raised a similar concern, pointing out that since 2000, the only counties where death sentences had been imposed were King and Pierce, accounting for 5 death sentences in that 12-year span. *Davis*, 175 Wn.2d at 388 (Fairhurst, J, dissenting).[7]

Since 2006, about 131 additional death eligible aggravated murder cases have been brought. Executions themselves are extremely rare. Since 1987, five executions have occurred, three of which occurred when the defendants waived their right to challenge their convictions and sentences. No executions will take place in the near or foreseeable future based on Governor Jay Inslee's issuance of a reprieve against executions during his tenure.

No death penalties have been imposed since 2011. Currently, no pending prosecutions seeking the death penalty exist. During that same time, dozens, if not

---

[7] Report of Trial Judge (TR) 194 (Covell Thomas); TR 216 (Allen Gregory); TR 220 (Dayva Cross); TR 251 (Robert Yates Jr.); TR 303 (Conner Schierman).

tens of dozens, of aggravated murder prosecutions have occurred. Since 2000, only three county prosecutors have filed death notices, and in two counties, death was imposed: Snohomish County in *State v. Scherf* (No. 95-1-02242-2) and King County in *State v. Schierman* (No. 06-1-06563-4). Apparently, based on many reasons, seeking the death penalty is not an option in the other 36 counties. *Where a crime is committed is the deciding factor, and not the facts or the defendant.*

The phrase often used where such infrequency is concerned is "the odds are similar to lightning striking an individual." This presents constitutional problems.

As is also revealed in the Final Report of 2006, approximately 300 aggravated murder convictions have been entered since 1981. Of this group, about 270 were death eligible. In about 80 cases, the prosecutor filed the death notice, and in about 30 cases, the jury imposed death. Five executions have taken place. Of the remaining cases, 19 were reversed on appeal and, on remand, the defendants were sentenced to life without parole (leaving 6 out of approximately 300).

Based on this report and what additional information we now have, it cannot be said that trials resulting in death sentences are reliable. Where the vast majority of death sentences are reversed on appeal and ultimately result in life without parole, reliability and confidence in the process evaporates.

What this systemic analysis discloses is clear. Since the opinions in *Cross*, and again in *Davis*, were filed, we know more about the administration of capital cases today. Importantly, a much more complete set of trial court reports exists. We also have death penalty prosecutions where the penalty was not imposed and others where the notice was withdrawn or never filed. We also have the governor's "reprieve," effectively halting executions for the foreseeable future. In the majority of our 39 counties, no death penalty has ever been sought. The current death row population arose from just 6 counties.

The trend is apparent and the indication clear that fewer county prosecutors elect to file a death notice. The death penalty simply does not exist as an option in the majority of the state's counties.

The concerns expressed in the dissents in *Cross* and *Davis* have grown and expanded. The number of counties where a death penalty prosecution is an option has been narrowed to, at most, three and may have currently been abandoned altogether by all counties.

The delay inherent in death sentence cases raises additional concerns, although much of the delay is a result of court review procedures. For example, Cal Brown, the most recent execution in 2010, committed his crime in 1991. Excepting the cases involving Schierman and Scherf, all other death row crimes

arose in the 1990s. The governor's action means no executions will occur in the foreseeable future. Where such delay exists, penological purposes in a death sentence are diminished. We often say, "Justice delayed is justice denied," especially for the victims' surviving family. The unfortunate result of delay diminishes whatever sense of justice is provided through an execution. As quoted earlier, the United States Supreme Court has recognized that where penological purposes cease to be promoted, the constitutional concerns expand.

Based on a review of the administration of death penalty cases, constitutional flaws have now become obvious. Under article I, section 14 of our state constitution, where a system exists permeated with arbitrary decision-making, random imposition of the death penalty, unreliability, geographic rarity, and excessive delays, such a system cannot constitutionally stand. The combination of these flaws in the system support our conclusion that the death penalty is unconstitutional. Although this analysis applies the constitutional principles analysis and requirements established by the United States Supreme Court, as it must, this analysis and conclusion rests on adequate and independent state constitutional principles. *See Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77

*State v. Gregory (Allen Eugene)*, No. 88086-7
(Johnson, J., concurring)


L. Ed. 2d 1201 (1983).