YU, J. (concurring)
¶49 This case touches on the issue of sentencing individuals to life without the possibility of *835 parole for a wide range of lower level offenses. I agree with the court's narrow holding that there is currently no categorical constitutional bar to the inclusion of an offense committed as a young adult as a predicate for purposes of the Persistent Offender Accountability Act ("Three Strikes Law"), RCW 9.94A.570. See majority at 610-11. But a punishment that may be constitutionally permissible today may not pass muster tomorrow.[1] I therefore write separately to express my growing discomfort with the routine practice of sentencing individuals to life without the possibility of parole, regardless of the offense or the age of the offender.
¶50 This court's decision in State v. Gregory limited the array of punishments that may be imposed for the most serious offenses by eliminating the death penalty. 192 Wash.2d 1, 427 P.3d 621 (2018) (plurality opinion). Every death sentence in this state has been commuted to the next most severe punishment available-life without the possibility of parole. Id. at 36, 427 P.3d 621. As a result, the range of offenses that require imposition of the most severe punishment the state can impose has been expanded. Persistent offenders who have committed robberies and assaults are now grouped with offenders who have committed the most violent of crimes, including aggravated murder and multiple rapes. The gradation of sentences that once existed before Gregory have now been condensed. As a result, a serious reexamination of our mandatory sentencing practices is required to ensure a just and proportionate sentencing scheme.
¶51 Our invalidation of the death penalty signified an effort to align this state's sentencing practices with society's expectations of a criminal justice system that is both fair *836 and free of bias and imposes punishment that is proportional to the crime. In recent years, we have also seen challenges to the death penalty in courts all over the country, including the United States Supreme Court, which evidences the public's discomfort with the imposition of death sentences. Though a number of states still utilize the death penalty, 37 states have not performed an execution in the last five years. States with No Recent Executions, DEATH PENALTY INFO. CTR. (July 8, 2019), https://deathpenaltyinfo.org/executions/executions-overview/states-with-no-recent-executions [https://perma.cc/ZY98-WYGC]. A nationwide decline in the use of the death penalty suggests that society's appreciation for the risk of error and recognition of the finality of such a sentence has become a limiting principle on the application of this most severe sentence. But the elimination of the death penalty only partially addresses these underlying concerns. In my view, our entire sentencing structure should also be reassessed.
¶52 There are similarities between the death penalty and life without parole. Justice Kennedy touched on these similarities in a case discussing the imposition of life without parole for juvenile offenders:
*622 The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency-the remote possibility of which does not mitigate the harshness of the sentence.
Graham v. Florida, 560 U.S. 48, 69-70, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Like the death penalty, a life sentence without the possibility of parole is the deprivation of hope. It is the forfeiture of liberty for life.
¶53 Proportionality in sentencing is required by both article I, section 14 of the Washington Constitution and the Eighth Amendment to the United States Constitution. E .g. , *837 Coker v. Georgia, 433 U.S. 584, 592, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977) ; State v . Fain, 94 Wash.2d 387, 402, 617 P.2d 720 (1980). It is well settled that our state constitution provides more protection for criminal offenders as it prohibits the imposition of cruel punishment, whereas the Eighth Amendment prohibits the imposition of cruel and unusual punishment. Fain , 94 Wash.2d at 393, 617 P.2d 720. Despite this heightened protection, this court has been reluctant to hold that life sentences without the possibility of parole are disproportionate and thus in violation of article I, section 14. See, e.g., State v. Witherspoon, 180 Wash.2d 875, 887-91, 329 P.3d 888 (2014) ; State v. Magers, 164 Wash.2d 174, 192-94, 189 P.3d 126 (2008) (plurality opinion); State v. Rivers, 129 Wash.2d 697, 712-15, 921 P.2d 495 (1996) ; State v. Manussier, 129 Wash.2d 652, 674-79, 921 P.2d 473 (1996).
¶54 The petitioners advocate for a proportionality analysis that considers the characteristics of the offender, including relative youth and culpability, in addition to the Fain factors. Although the current case law does not support this argument, there have been significant advancements in the scientific community to suggest that "emerging adults" should be treated as a distinct developmental stage in the criminal justice system.[2]
¶55 Those sentenced to life without a possibility of parole are treated as irredeemable and incapable of rehabilitation.
*838 The indefinite isolation of an individual conflicts with the prohibition on cruel punishment because removing the possibility of redemption is the definition of cruel. It may be difficult to understand how some of the most violent criminals could safely reenter society after incarceration. But even the most violent of criminals are entitled to have their constitutional rights respected. Life without parole sentences represent a " 'denial of hope; it means that good behavior and character improvement are immaterial.' " State v. Bassett, 192 Wash.2d 67, 88, 428 P.3d 343 (2018) (internal quotation marks omitted) (quoting Graham, 560 U.S. at 70, 130 S.Ct. 2011 ).
¶56 The penological goals thought to be advanced by long term incarceration are retribution, deterrence, incapacitation, and rehabilitation. As the majority notes, retribution and incapacitation may be achieved in some circumstances but deterrence and rehabilitation are not likely to be achieved by sentencing someone to life without parole. Majority at 617. When penological goals are not furthered by the imposition of a long term sentence such as life without parole, " 'it "is nothing more than the purposeless *623 and needless imposition of pain and suffering," and hence an unconstitutional punishment.' " Gregory, 192 Wash.2d at 24-25, 427 P.3d 621 (quoting Enmund v. Florida, 458 U.S. 782, 798, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982) (quoting Coker, 433 U.S. at 592, 97 S.Ct. 2861 )).
¶57 The criminal justice system is not one size fits all. Courts have been entrusted with discretion in sentencing because our society understands that each case is different. To assign one sentence for such a wide range of offenses is to disregard our notions of fairness and justice. Our analysis of proportionality must consider both the nature of the offense and the characteristics of the offender. Courts have already shown a willingness to consider the characteristics of an offender when it comes to age or intellectual disability. See Miller v. Alabama, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) ; Graham , 560 U.S. 48, 130 S.Ct. 2011. However, judicial *839 mercy should not be restricted to considerations of youthfulness or competency. There are adults who are also deserving of leniency and an individualized inquiry as to their level of culpability and capacity for rehabilitation. A judge cannot measure at sentencing an individual's capacity for change. Shon Hopwood, Second Looks & Second Chances, CARDOZO L. REV. (forthcoming 2019) (manuscript at 4) (https://ssrn.com/abstract=3404899); see also Michael M. O'Hear, Not Just Kid Stuff? Extending Graham and Miller to Adults, 78 MO. L. REV. 1087 (2013) (analyzing Graham, Miller, Ewing, and Harmelin[3] and reconciling the varying outcomes of each case based on principles of culpability, legislative deference, and aversion to certain sentencing practices).
¶58 When considering life sentences, it is also important to recognize the disparate impacts that the criminal justice system has on people of color. This i necessarily results in disparate impact in the imposition of life sentences. One size fits all approaches to sentencing reveal the institutional and systemic biases of our society. See Amicus Curiae Br. of the Am. Civil Liberties Union of Wash. 8-11. The effects of disproportionate enforcement of criminal laws against people of color, especially African-Americans, will continue-exaggerated by laws that limit the discretion of trial judges in sentencing decisions.
¶59 We can and must avoid the imposition of a cruel punishment by providing an opportunity for release to every convicted defendant. One way to do this would the Sentencing! Reform Act of 1981, ch. 9.94A RCW.[4] Such a board could provide an opportunity *840 for a confined individual to show evidence of rehabilitation and genuine transformation.
¶60 In recent years, a robust academic discussion has developed regarding the impacts that incarceration has on family, friends, and the greater community. See, e.g., Hopwood, supra. Longer sentences exacerbate these consequences while decreasing the potential for rehabilitation. Id. (manuscript at 8). We should not be satisfied with the status quo; permanent incarceration has neither reduced crime nor increased confidence in our criminal justice system. The principles set forth in Gregory compel us to ask the same questions about a life sentence without the possibility of parole. Is it fairly applied? Is there a disproportionate impact on minority populations? Are there state constitutional limitations to such a sentence? I dare say that these questions are not just academic. They also reflect our values and beliefs about punishment and our criminal justice system. We should join the national movement favoring release upon a showing of rehabilitation and inject into our sentencing practices the exercise of mercy, compassion, and the fact that we know not a person's capacity to change. As Shakespeare so eloquently put it, "And earthly power doth then show likest God's When mercy seasons justice." WILLIAM SHAKESPEARE, THE MERCHANT OF VENICE , act 4, sc. 1.
González, J.
Madsen, J.

Interpretation of the Eighth Amendment to the United States Constitution is not static but, instead, " 'draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society.' " Kennedy v. Louisiana, 554 U.S. 407, 419, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008) (alteration in original) (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion)). This holds true for article I, section 14 of our state constitution as well.

Dr. Jeffrey Arnett first coined the term "emerging adult" in 2000. Selen Siringil Perker et al., Columbia Univ. Justice Lab, Emerging Adult Justice in Illinois: Towards an Age-Appropriate Approach 2 (2019), https://justicelab.columbia.edu/sites/default/files/content/EAJ%20in%20Illinois%20Report%20Final.pdf [https://perma.cc/TJ4C-NVYM]. Further research has concluded that persons age 18 to 25 tend to act impulsively and are more susceptible to peer pressure and emotions, but they also have a greater capacity for reform than older adults. Anjali Tsui, How Brain Science Is Changing How Long Teens Spend in Prison, Frontline (May 2, 2017), https://www.pbs.org/wgbh/frontline/article/how-brain-science-is-changing-how-long-teens-spend-in-prison [https://perma.cc/8CAZ-AB6K]. These findings have already influenced legislation in many states-including Washington-that is geared toward providing emerging adults with age-appropriate services during incarceration through the juvenile justice system. See generally RCW 13.04.030 ; State v. Watkins, 191 Wash.2d 530, 547-52, 423 P.3d 830 (2018) (Yu, J., dissenting); Clare Ryan, The Law of Emerging Adults, 97 Wash. U. L. Rev. (forthcoming 2019); Stephanie Tabashneck, "Raise the Age" Legislation: Developmentally Tailored Justice, 32 Crim. Just ., no. 4, 2018, at 13 (papers.ssrn.com/so13/papers.cfm?abstract_id=3336932).

Harmelin v. Michigan, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991).

The federal system has also been exploring policy options that will increase reentry for incarcerated individuals. See, e.g., First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 ; 28 C.F.R. § 572.40 (compassionate release under 18 U.S.C. § 4205(g) ).