# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of<br><br>MIGUEL ANGEL ALBARRAN,<br><br>Petitioner. | No. 51575-0-II<br><br>UNPUBLISHED OPINION |

GLASGOW, J.—Miguel Angel Albarran's girlfriend saw Albarran in her 13-year-old daughter's room with his face near her daughter's vaginal area while the child was sleeping. Testing revealed male semen and saliva on the child's underwear and thigh, and DNA from the samples matched Albarran's DNA. Albarran was convicted of second degree rape.

Albarran filed a timely CrR 7.8 motion to vacate the judgment and sentence, which was transferred to this court as a personal restraint petition (PRP). He argues that his conviction should be vacated and an earlier plea offer should be reinstated because his counsel failed to provide effective assistance during pretrial plea negotiations. Alternatively, he requests a new trial based on the ineffective assistance of his counsel during trial and prosecutorial misconduct. We deny his petition.

## FACTS

### I. FACTS UNDERLYING THE CONVICTION

Albarran and DD were in a relationship and lived together. They also lived with DD's 13-year-old daughter, TP. One morning, while walking past TP's room, DD saw Albarran on TP's bed with his face near her vaginal area. Albarran said he was "'just covering her up'" with a

blanket. Verbatim Report of Proceedings (VRP) (Jan. 14, 2014) at 251. TP was sleeping and did not remember anything that happened while she was asleep.

DD called the police. The police took TP's underwear for testing, and DD took TP to the hospital for a sexual assault examination. The police and the hospital gathered and preserved DNA evidence from TP's underwear, inner thighs, and external vaginal area. Some of the DNA matched Albarran's DNA.

## II. CHARGES AND PLEA OFFERS

The State initially charged Albarran with one count of second degree child molestation. In September 2013, the prosecutor informed Albarran's counsel that Albarran could either plead as charged or the State would bring additional charges of second degree rape of a child, second degree rape, attempted second degree rape of a child, attempted second degree rape, and indecent liberties. Albarran did not plead as charged, and the State amended the information to add the additional charges. It later added as aggravating circumstances that Albarran abused his position of trust and invaded the victim's privacy.

Nevertheless, the prosecutor kept open the original offer to plead to a single count of second degree child molestation, explaining that she would like "to spare the victim a trial." Ex. 3. On November 18, 2013, the prosecutor sent this offer to Albarran's counsel as a formal, written, pretrial settlement agreement. The written offer listed the standard sentencing range for second degree child molestation as 15 to 20 months, plus a 36-month term of community custody.

In an e-mail dated November 20, 2013, Albarran's counsel told the prosecutor, "with regard to the plea offer, I spoke with Mr. Albarran and he has asked me to mail him the offer . . .

so that he can review it with his family before he makes a decision." Suppl. Clerk's Papers (SCP) at 155.

Albarran did not take the State's offer and, prior to trial, the State added another aggravating circumstance to the second degree rape charge—that the victim was under 15 years of age. The prosecutor emphasized in an e-mail to Albarran's counsel that if the jury found Albarran guilty on this count and found this aggravating circumstance, Albarran would face a 25-year mandatory minimum sentence. Albarran proceeded to trial.

### III. TRIAL

A.    Testimony

At trial, TP testified that on the morning of the incident, she woke up to her mother yelling. Albarran was in her bedroom. Her underwear was wet, and she described her vaginal area feeling "like being tickled, but less." VRP (Jan. 13, 2014) at 59. The responding officer who took TP's underwear into evidence also described it as "wet . . . [i]n a spot where -- that would've been covering the girl's vagina." *Id.* at 50. DD testified that she saw Albarran's "face . . . right at [TP's] vagina[l] area." VRP (Jan. 14, 2014) at 251.

*DNA Evidence:* A DNA analyst testified that she found amylase, a component of saliva, on TP's external vaginal area and left thigh. The DNA on TP's left thigh was "6.6 million times more likely" to be a mixture of TP's DNA with Albarran's DNA, rather than TP and a random person. *Id.* at 202.

The analyst also found amylase, sperm cells, and a component of semen on TP's underwear. She testified that it is "210 trillion times more likely" that the "non-sperm fraction" of this DNA was a mixture of TP's and Albarran's DNA, rather than TP and a random person. *Id.* at

211. As for the "sperm fraction" of this DNA, it "matched Miguel Albarran," meaning it was "exactly the same" as his reference sample. *Id.* at 212. The probability of this DNA matching another random person's DNA was "1 in 780 quadrillion." *Id.*

The analyst testified on cross-examination that DNA can remain on inanimate objects for a long time and be transferred from one object to another. On redirect, she clarified that the DNA was consistent with a mixture of only two people—TP and Albarran.

*Albarran's Defense:* During his direct examination, Albarran made an offer of proof that the DNA could have been transferred to TP's vaginal area by a vibrator that he and DD used during sexual intercourse. He claimed DD or the police may have transferred the DNA, or that the DNA may have been transferred by TP herself because DD had said that she thought TP also used the vibrator. The trial court excluded testimony about what DD allegedly said as inadmissible hearsay.

The defense also focused on Albarran's history of cheating during his relationship with DD to suggest that DD was a biased witness. Albarran told the jury that he was "a dog" and had cheated on DD with numerous women. *Id.* at 343. He testified, "As soon as we got together, . . . I was messing with a lot of girls." *Id.* at 348. Detective Jason Hafer, who investigated the case, recalled that when he interviewed Albarran, he asked, "'Well, what would [DD] have seen that would make her think that your face was on [TP's] vagina?'" *Id.* at 305. Albarran did not answer this question directly and instead talked "about multiple women he'd cheated with while he was dating [DD]." *Id.* at 306.

When Albarran testified in his defense, he told the jury that he did not sexually assault TP and that he was in TP's bedroom because he noticed her blanket on the floor and wanted to cover her up again. TP recalled that after she woke up, she heard Albarran say, "'I'm just covering her.'"

4

VRP (Jan. 13, 2014) at 58. DD testified that Albarran did not have a blanket in his hand, and law enforcement recalled that DD "insisted . . . she had not seen a blanket in [Albarran's] hands," saying, "'I know what I saw.'" *Id.* at 151.

*Testimony About Lack of Confessions:* Defense counsel asked the responding officers whether Albarran ever confessed to the crime. Counsel also asked Hafer if Albarran made any confessions or admissions. Hafer responded that Albarran did not confess to anything, but he made statements that were "intriguing and . . . contradictory." VRP (Jan. 14, 2014) at 323. Counsel then asked whether Hafer listened to Albarran's jail calls and whether Albarran made any confessions or admissions in the jail calls. Hafer responded, "There were no direct confessions made, no," and defense counsel pressed, "What was the indirect confession?" *Id.* at 325. Hafer admitted, "I don't speak Spanish, so I don't know what was said," but he heard Albarran reference DNA and "took it that [Albarran] was concerned that DNA evidence had been collected." *Id.* at 325-26.

When Albarran testified, he explained that during the jail call, he was merely responding to his aunt's question asking what evidence the State told Albarran they had. Albarran also emphasized in his testimony that he never confessed or admitted to anything.

*Criminal History:* Defense counsel asked the trial court to exclude any information about Albarran's criminal history or prior arrests, and the State agreed that it did not intend to elicit this information. Yet, defense counsel then asked whether Hafer looked into Albarran's criminal history prior to his arrest in this case. Hafer responded, "I attempted to, yes." *Id.* at 324. The trial court sustained the State's objection to defense counsel's follow-up question, and counsel moved on.

Defense counsel also asked Albarran whether he had any prior sexual assault or felony convictions, and Albarran testified that he did not. The State then asked Albarran if he had ever been arrested, to which Albarran said that he was arrested once but quickly released because it was a case of "mistaken identity." *Id.* at 363.

*Inconsistent Statements:* The State asked Albarran about some of his prior statements in an attempt to highlight inconsistencies. For example, the State asked whether Albarran told his family that DD had gotten him fired from his job and then told the police that he had put in his two-weeks notice.

Albarran also remarked during his testimony that DD would hit him and kick him out whenever he confessed to cheating. The State objected and, without expressly ruling on the objection, the trial court reminded Albarran that references to specific acts of hitting or striking were irrelevant and prejudicial. The State later called a case worker from Child Protective Services to testify that Albarran had previously "denied any history of domestic violence." *Id.* at 372.

B.      Closing Argument

During closing argument, the prosecutor directed the jury's attention to the reasonable doubt instruction and said, "This is one that your attention will be drawn to repeatedly by the defense. Because when all the evidence is out there, when you have a very simple case such as this one, that [is] all they can hammer on is reasonable doubt." VRP (Jan. 15, 2014) at 413. She then read the reasonable doubt instruction.

She also told the jury that it could judge Albarran's credibility based on how "consistent or inconsistent he was." *Id.* at 424. She listed several circumstances where she alleged Albarran made inconsistent statements and concluded, "He lies." *Id.* at 426.

6

Albarran's counsel began his argument by explaining that very few cases go to trial, "[b]ut of the ones that end up going to trial, there's usually certain factors, certain evidence that the State relies on in proving a defendant guilty. Not in every case but in many cases. And one of those things that they rely on is confessions or admissions." *Id.* at 429. He argued, "Mr. Albarran[] never made any admissions or confessions to anybody." *Id.* Counsel reiterated that Albarran had no prior sexual assault or felony convictions and that he was released three hours after his only prior arrest because the police "arrested the real guy." *Id.* at 435.

Counsel also suggested that Albarran and DD's relationship was "way worse than [DD] let on" and that "the numerous affairs -- talk about bias -- had an impact on this case and had an impact on what you heard from [DD]." *Id.* at 439-40. He recalled the testimony that DNA could be transferred from inanimate objects and argued, "Mr. Albarran doesn't know how his DNA got on [TP], but he does know that [DD] was livid with him, despite what she said, regarding his numerous and many affairs." *Id.* at 441.

In rebuttal, the prosecutor argued, "If there was a confession, you have to ask yourself, would we be here?" *Id.* at 451. She continued, "I'll . . . tell you why someone would take this trial. Why this defendant would take this trial. This defendant is arrogant. He cheated on [DD] by her count four times, by his a gazillion. And each time he was able to talk his way back into the house." *Id.* "Even with DNA evidence, he thinks he can tell you, I don't know; I don't know how my DNA got there. How many times do you think he used that?" *Id.*

She also argued more generally, "Child molesters are arrogant." *Id.* at 452. Defense counsel objected to this as profile evidence, and the trial court sustained the objection. The trial court

instructed, "The jury will disregard the characterization, and we will stick to the evidence in this case." *Id.*

With respect to Albarran's criminal history, the prosecutor told the jury, "And he also raises this -- these crimes, these other crimes that the defendant was not found guilty or -- the defendant had no criminal history. He presupposes that we would even be able to bring that and put that in front of you if he did. And that's nothing for you to consider." *Id.* at 453.

C. Verdicts

The jury found Albarran guilty as charged and returned special verdicts finding each of the aggravating circumstances, including that Albarran used his position of trust to facilitate the crime, that Albarran violated the victim's privacy, and (for the second degree rape charge) that the victim was less than 15 years old. The trial court imposed the mandatory 25-year sentence on the second degree rape conviction and vacated Albarran's other convictions based on double jeopardy. The Washington Supreme Court affirmed Albarran's sentence. *State v. Albarran*, 187 Wn.2d 15, 26, 383 P.3d 1037 (2016).

IV. PERSONAL RESTRAINT PETITION

Albarran timely filed a CrR 7.8 motion to vacate the judgment and sentence, citing ineffective assistance of counsel before and during trial, as well as prosecutorial misconduct. He argued that before trial, his counsel "failed to adequately describe the plea offer and the consequences of proceeding to trial in an understandable way," that Albarran has "difficulty understanding and processing oral information," and that his counsel only met with him for "a few 20-minute meetings . . . at Starbucks." PRP at 2. He claimed ineffective assistance in his counsel's trial representation because counsel opened the door to Albarran's arrest history, elicited damaging

8

opinion testimony from Hafer, and failed to lay a proper foundation for the vibrator evidence in support of Albarran's defense theory. Albarran also claimed that the prosecutor committed misconduct during closing argument and that his counsel was deficient for failing to object to the misconduct.

As a remedy, Albarran requested that the State reinstate its offer to plead to a single count of second degree child molestation with a standard sentencing range of 15 to 20 months. In the alternative, he requested a new trial. The motion was transferred to this court for consideration as a PRP.

In a sworn declaration, Albarran said, "I was later told, after my conviction, that I could have pled guilty and spent just a little more than a year in jail. This is news to me. I thought that I would receive up to 15 years if I pled guilty." SCP at 127. He insisted, "If I knew that I would be out in about a year[,] I would have been upset at pleading guilty to something I didn't do, but I would have taken the deal." *Id.* He also declared, "It was only after I was convicted that I learned the judge had to give me 25 years for the second-degree rape and that the judge could not give me less even if the judge wanted to." SCP at 128. Albarran submitted declarations from family members detailing his limited education and his difficulties with comprehension. The State did not submit a declaration directly from Albarran's defense counsel to refute Albarran's descriptions of their communications. Instead, the State submitted its hearsay account of a voicemail message from defense counsel.

We remanded for a reference hearing and asked the trial court to answer 10 questions related to Albarran's pretrial conversations with his counsel and his comprehension. At the reference hearing, Albarran testified about his understanding of the case and the plea offers, and

two members of Albarran's family testified about his challenges processing and understanding information. Albarran's trial counsel and the prosecutor both testified about their recollections of the case.

The trial court found that as a child, Albarran was in special education classes, and he dropped out of school in 9th grade. He "has had a problem with comprehension all his life," and at times he needs to have things explained to him "more than once . . . in English and Spanish in simpler terms." Trial Ct.'s Findings of Fact after Reference Hr'g (FOF) at 8. Albarran has been working toward his general education diploma while incarcerated, but as of 2020, he was still "reading a little below the 6[th] grade level" and "demonstrat[ing] difficulty with oral instruction." *Id.* Defense counsel was not aware that Albarran had any cognitive impairments and remembered that Albarran was "articulate, spoke well, and seemed to be a fairly sharp individual." *Id.*

The trial court also found that at least two of Albarran's meetings with his counsel took place at a Starbucks and that the Starbucks "was very crowded at the time of the first meeting." FOF at 2. However, it found that other meetings occurred "in the Clark County courthouse in an attorney client conference room, in the law library [at the courthouse], or at [defense counsel's] office in Battleground, [Washington]. Each meeting lasted 20-40 minutes." *Id.*

The trial court noted that Albarran's counsel's testimony at the reference hearing was "mostly based on his standard practice, not his independent recollection," because counsel did not have an "independent recollection of his contacts with Albarran." *Id.* However, counsel's "practice is to sit down and discuss offers with his clients," including "the amount of time being offered" and "the client's exposure." FOF at 5. The trial court found that Albarran's counsel "specifically remembered showing the full police report and reading it to Albarran numerous times." FOF at 2.

He "told Albarran an offer had been made right after he received it," and he "recalled communicating more than one plea offer to Albarran and encourag[ing] him to consider one of the offers." FOF at 5-6.

The trial court's findings refer to two discussions of a plea offer from the State, one in September 2013 and one in November 2013. The findings do not contain the details of the September 2013 offer, but the trial court found that defense counsel said, "Albarran had rejected the first offer" to plead guilty as charged to a single count of child molestation, so if the prosecutor wanted to amend the charges, "she should do it." FOF at 3. "Albarran was adamant he was innocent." *Id.*

After amending the charges to add second degree rape of a child, attempted second degree rape of a child, second degree rape, attempted second degree rape, and indecent liberties, the State again offered for Albarran to plead to "a single count of child molestation in the second degree with a standard range of 15-20 months." FOF at 3-4. Defense counsel sent an e-mail to the prosecutor explaining that he had conveyed the offer orally and that Albarran had requested counsel mail him a copy of the written offer. Albarran did not remember receiving a letter with the State's formal, written offer to plead only to child molestation, but he said, "It is possible that it arrived and I did not read it." SCP at 127. Albarran remembered receiving one plea offer a couple of months before trial that would have been for 15 years, not 15 months. The record does not show documentation of a 15-year plea offer.

Before Albarran was arraigned on the aggravating circumstance that would trigger the 25-year mandatory minimum, defense counsel "suggested . . . that they talk to [the prosecutor] about taking a previous offer. Albarran said no." FOF at 5. At the readiness hearing where he was

arraigned on the additional aggravating circumstance, Albarran "alleged [the prosecutor] was trying to bully him. He also stated he was not going to take an offer." FOF at 4. The prosecutor recalled that at this hearing, defense counsel said that "he tried to negotiate with Albarran prior to the filing of the aggravator on more than one occasion." *Id.*

Additionally, defense counsel was sure he discussed the 25-year mandatory minimum sentence with Albarran more than once. In a prior interview, he had stated, "'[W]e had so many discussions about the 25 year [sentence], . . . I – was frustrated with [Albarran] for just seeming to be naïve about being found guilty and risking 25 plus years of his life.'" FOF at 7 (first alteration in original). The trial court found that Albarran's counsel informed him that if he were convicted, he would face a 25-year sentence.

The prosecutor also "recalled that at multiple prior hearings Albarran stated he would not accept any offer." FOF at 4. She remembered "Albarran shaking his head and stating he did not do anything." FOF at 6. The trial court concluded, "From the beginning Albarran was adamant that he was not guilty; that he was not going to accept a plea offer." FOF at 5.

ANALYSIS

I. PRP STANDARDS

A PRP is not a substitute for a direct appeal, and the availability of collateral relief is limited. *In re Pers. Restraint of Grasso*, 151 Wn.2d 1, 10, 84 P.3d 859 (2004). To be entitled to relief through a PRP, the petitioner must establish either a constitutional error that caused actual and substantial prejudice or a nonconstitutional error that is "'a fundamental defect resulting in a complete miscarriage of justice.'" *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013) (quoting *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007)). For

a claim of ineffective assistance of counsel, if a petitioner establishes prejudice under the *Strickland*[1] test, they have necessarily met their burden to show actual and substantial prejudice in the context of a PRP. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012). For a claim of prosecutorial misconduct, the petitioner must show that the prosecutor's misconduct "resulted in actual and substantial prejudice" or "a complete miscarriage of justice." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Albarran contends that his counsel provided ineffective assistance both before and during trial. We disagree.

Criminal defendants are entitled to the effective assistance of counsel under both the federal and state constitutions. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, §§ 3, 22. The Sixth Amendment to the United States Constitution right extends to all critical stages of a criminal proceeding, including the plea negotiation stage. *Lee v. United States*, ___ U.S. ___, 137 S. Ct. 1958, 1964, 198 L. Ed. 2d 476 (2017); *In re Pers. Restraint of Garcia-Mendoza*, 196 Wn.2d 836, 844, 479 P.3d 674 (2021).

To prove ineffective assistance, the petitioner must show that (1) counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced them. *State v. Humphries*, 181 Wn.2d 708, 719-20, 336 P.3d 1121 (2014) (applying *Strickland*, 466 U.S. at 687-88). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700.

---

[1] *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

The defendant faces a strong presumption that counsel's representation falls within the broad range of reasonably effective assistance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). We afford significant deference to trial counsel's decisions. *Id.* And we make "'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Id.* at 34 (quoting *Strickland*, 466 U.S. at 689).

"Prejudice exists if there is a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). "The defendant must affirmatively prove prejudice" by showing "a probability sufficient to undermine confidence in the outcome." *Id.*

A.      Assistance of Counsel Before Trial

Albarran first argues that his counsel "failed to adequately describe the plea offer and the consequences of proceeding to trial in an understandable way." PRP at 2. "Effective assistance of counsel includes assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial." *State v. A.N.J.*, 168 Wn.2d 91, 111, 225 P.3d 956 (2010). "Defense counsel must actually and substantially assist a client in deciding whether to plead guilty," which means they "must communicate actual offers, discuss tentative plea negotiations, and discuss the strengths and weaknesses of the defendant's case so that the defendant knows what to expect and can make an informed decision." *State v. Edwards*, 171 Wn. App. 379, 394, 294 P.3d 708 (2012). Because the decision of whether to plead guilty must be an informed one, our inquiry does not end where a defendant "declined to negotiate from the outset." *Estes*, 188 Wn.2d at 466. If they were

14

"lacking knowledge about a key matter in [their] case," there may be "a reasonable probability that had [the defendant] been fully informed, [they] would have negotiated a different outcome." *Id.*

Albarran's primary argument is that his counsel did not adequately communicate with him about the State's plea offers in light of his cognitive disabilities. Yet, Albarran cites no case establishing a specific heightened standard for attorneys where the defendant has a learning disability. "We review the issue by asking whether defense counsel communicated the offers to the defendant and whether the defendant has demonstrated a reasonable probability that the defendant would have accepted the offer." *Edwards*, 171 Wn. App. at 394.

The trial court found that Albarran was informed of the State's offer to plead to a single count of second degree child molestation, which would have resulted in a standard sentencing range of 15 to 20 months, and that he rejected this offer. Additionally, the trial court found that Albarran was informed of the potential consequences of proceeding to trial, including a 25-year mandatory minimum sentence.

Albarran argues that even if his counsel accurately conveyed the offer to plead only to second degree child molestation, counsel did not adequately explain it in a way that ensured Albarran understood. Albarran claims he thought the offer involved a 15-year sentence, not a standard range of 15 to 20 months, and he did not understand that he faced a 25-year mandatory sentence if convicted of second degree rape of a 13-year-old child at trial. Albarran "has had a problem with comprehension all his life" and "demonstrates difficulty with oral instruction." FOF at 8. At times, he needs information to be repeated "multiple times" or explained "in simpler terms." *Id.* But the record shows that Albarran's counsel did communicate the plea offer to Albarran both orally *and* in writing and that he did so *multiple* times. *See* Ex. 3 (formal settlement

15

agreement reducing the offer to writing); *see also* SCP at 155 (E-mail from counsel dated November 20, 2013: "with regard to the plea offer, I spoke with Mr. Albarran and he has asked me to mail him the offer.").[2]

The record also shows that counsel discussed the 25-year mandatory sentence with Albarran multiple times. In an interview discussed in the trial court's findings, counsel said that he and Albarran had "'so many discussions'" about Albarran's exposure to the 25-year mandatory sentence. FOF at 7. Moreover, at a trial readiness hearing, counsel stated that "he tried to negotiate with Albarran prior to the filing of the aggravator on more than one occasion." FOF at 4.

In sum, Albarran's counsel conveyed the State's offer and the risks of going to trial to Albarran multiple times, both in writing and orally, over the phone and in person. Albarran had weeks, if not months, to consider the State's offer and the risks of trial. Additionally, defense counsel did not perceive any issue with Albarran's competency. Albarran cites to no authority that requires counsel to do more to adequately convey the offer and the risks of going to trial under these circumstances. Albarran has not shown that his counsel failed to communicate the State's offers or to discuss the potential consequences of proceeding to trial, even considering any cognitive disabilities.

Albarran also fails to show a reasonable probability that, with more information, he would have negotiated a different outcome. The trial court found that "[f]rom the beginning Albarran was adamant that he was not guilty; that he was not going to accept a plea offer." FOF at 5. At the readiness hearing where he was arraigned on the aggravating circumstance that would trigger the

---

[2] We briefly note, however, that we do not condone defense counsel having privileged attorney-client conversations in crowded public places, such as Starbucks.

25-year mandatory sentence, Albarran said the prosecutor was "trying to bully him" and "he was not going to take an offer." FOF at 4. The prosecutor also recalled that "at multiple prior hearings Albarran stated he would not accept any offer." *Id.* She remembered "Albarran shaking his head and stating he did not do anything." FOF at 6. Similarly, Albarran's counsel recalled being "'frustrated with [Albarran] for just seeming to be naïve about being found guilty and risking 25 plus years of his life.'" FOF at 7. After the trial was over, Albarran declared, "If I knew that I would be out in about a year[,] I would have been upset at pleading guilty to something I didn't do, but I would have taken the deal." SCP at 127. This posttrial declaration is insufficient to overcome the substantial evidence demonstrating that Albarran was unwilling to negotiate before trial. Albarran fails to show he received ineffective assistance of counsel during pretrial negotiations.

Albarran specifically challenges the sufficiency of the evidence to support two of the trial court's factual findings—that Albarran's meetings with his counsel lasted between 20 and 40 minutes and that Albarran's counsel reviewed the police report with him multiple times. Albarran is correct that there is no evidence to support a finding that some meetings lasted 40 minutes. He testified at the reference hearing that the longest time he met with his counsel was for "[t]wenty, twenty-five minutes." VRP (Jan. 9, 2020) at 108. The State acknowledged in its argument, "we know somewhere between four and eight 20-minute meetings to 25-minute meetings is what they had." *Id.* at 217. Additionally, the trial court's finding that Albarran's counsel "specifically remembered showing the full police report and reading it to Albarran numerous times" is inconsistent with the trial court's finding that counsel "stated he has no independent recollection

of his contacts with Albarran." FOF at 2. Yet even if we disregard these factual findings, our legal conclusion remains the same.

B.    Assistance of Counsel During Trial

Albarran also argues his counsel was ineffective during trial because counsel opened the door to Albarran's arrest history, elicited damaging opinion testimony from Hafer, failed to lay a proper foundation to admit evidence supporting Albarran's defense theory, and failed to object to misconduct during the prosecutor's closing argument. Even assuming without deciding that Albarran's counsel's performance was deficient, Albarran fails to show prejudice. Due to the strength of the DNA evidence and DD's eyewitness testimony, Albarran cannot show "a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Estes*, 188 Wn.2d at 458 (quoting *Kyllo*, 166 Wn.2d at 862).

1.    Opening the door

Albarran argues that his counsel was ineffective because counsel opened the door to evidence of Albarran's arrest history. We conclude Albarran was not prejudiced by testimony explaining that the only time he was previously arrested was when police mistook him for the suspect of a crime he did not commit. The fact that Albarran was innocent of a separate crime did not undermine his presumption of innocence for the present crime.

Albarran also argues his counsel was ineffective for failing to object when the prosecutor asked about his arrest history because this violated the trial court's ruling not to discuss criminal history. "'Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" *State v. Johnston*, 143 Wn. App.

1, 19, 177 P.3d 1127 (2007) (quoting *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989)). This was not an egregious circumstance, nor was it testimony central to the State's case. To the contrary, Albarran first raised his own criminal history.[3]

### 2. Eliciting opinion testimony

Albarran also argues his counsel elicited damaging opinion testimony from Hafer regarding statements Albarran made during a jail call. Albarran was not prejudiced by this testimony either. Although Hafer testified that he "took" Albarran's statement to mean Albarran "was concerned that DNA evidence had been collected," Hafer admitted that he could not understand the entire conversation because it was primarily in Spanish. VRP (Jan. 14, 2014) at 325. Albarran then had the opportunity to explain the context of his statement during his own testimony. Regardless, Hafer's obviously speculative statements about the import of the DNA evidence did not prejudice Albarran in light of the strength of the actual DNA evidence. The jury was presented with evidence that the "sperm fraction" of DNA from TP's underwear "matched Miguel Albarran" and that the odds of it belonging to another random person were "1 in 780 quadrillion." *Id.* at 212.

### 3. Alternative theory of DNA transfer

Albarran wanted to admit evidence suggesting his DNA could have been transferred to TP by a vibrator. But his counsel only sought to admit this evidence through direct examination of Albarran, and in that context, the statements were inadmissible hearsay. Albarran testified, "I heard

---

[3] Albarran adds that he was "woefully unprepared to face the prosecutor's questions on the witness stand," PRP at 19, and that his counsel "never helped [him] get ready to testify in court," SCP at 127. Albarran provides no further explanation of what additional preparation he thinks should have occurred. Moreover, he has not shown how additional preparation would have affected the outcome at trial.

it from the mom [DD]" that one day the vibrator was missing and she thought TP had taken it. *Id.* at 352. He testified that DD had allowed TP to use the vibrator and that Albarran knew this because he and DD "had a conversation" about it. *Id.* at 353.

Albarran argues his counsel was ineffective because counsel failed to lay a proper foundation to admit this evidence. Evidence indicating that Albarran's DNA could have been transferred to TP by the vibrator would have been relevant and would have lent "some credence to Albarran's claims of innocence." *State v. Albarran*, No. 46162-5-II, slip op. at 15 (Wash. Ct. App. Dec. 1, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2046162-5-II%20Unpublished%20Opinion.pdf. Nevertheless, in light of all of the facts presented at trial, Albarran cannot show prejudice.

An expert did testify that DNA can transfer from one inanimate object to another. And DD allegedly stated that she had previously allowed TP to use the same vibrator Albarran and DD used. But even if Albarran's counsel had asked DD directly about whether TP had obtained her permission to use the vibrator, that testimony too could have involved objectionable hearsay. Albarran contends that his counsel "could have simply focused on admitting the vibrator without [DD's related] statements." PRP at 22. But a vibrator alone, without testimony explaining its potential relevance to the charged crime, would have no evidentiary value.

Moreover, DD testified that she saw Albarran's face near TP's vaginal area on the morning of the offense, and Albarran did not deny that he was in TP's bedroom. TP and the police who responded noted that although she had been asleep, TP's underwear was wet. Albarran only offered evidence that DD said she allowed TP to use the vibrator at some point in the past, not that TP had actually used it, or if so, that she had used it recently. Finally, the sperm fraction of the DNA from

20

TP's underwear belonged to Albarran with a "1 in 780 quadrillion" probability of error. VRP (Jan. 14, 2014) at 212. There was no DNA from a third person, such as DD. Given the strength of the DNA evidence, DD's testimony about what she saw, and the weaknesses in Albarran's theory, he fails to "undermine confidence in the outcome" of the trial. *Estes*, 188 Wn.2d at 458.

#### 4.    Cumulative error

Albarran also argues that cumulative instances of deficient performance deprived him of a fair trial. However, he raises cumulative error for the first time in his reply brief, so we do not consider this claim. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration."). In sum, Albarran fails to show deficient performance during pretrial plea negotiations. Even assuming Albarran's counsel performed deficiently during trial, Albarran fails to show prejudice.

### III. PROSECUTORIAL MISCONDUCT

Albarran argues that the prosecutor engaged in misconduct during closing argument that requires reversal. We disagree.

To establish prosecutorial misconduct, the petitioner must prove that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). If the petitioner shows that the conduct was improper, there are two different standards for evaluating prejudice. *Id.* at 760. If the petitioner objected at trial, they must show that the misconduct "had a substantial likelihood of affecting the jury's verdict." *Id.* If the petitioner failed to object during trial, they are "deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting

prejudice." *Id.* at 760-61. In a PRP, the petitioner must additionally show that "the prosecutor's flagrant and ill-intentioned misconduct caused [them] actual and substantial prejudice." *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 166, 410 P.3d 1142 (2018).

First, Albarran argues that the State trivialized the reasonable doubt standard when "the prosecutor portrayed this instruction as a last refuge for guilty defendants." PRP at 24. We disagree with Albarran's characterization of the prosecutor's argument.

"In essence, the State acts improperly when it mischaracterizes the standard as requiring anything less than an abiding belief that the evidence presented establishes the defendant's guilt beyond a reasonable doubt." *State v. Feely*, 192 Wn. App. 751, 762, 368 P.3d 514 (2016). Here, the prosecutor told the jury, without objection, that the reasonable doubt instruction "is one that your attention will be drawn to repeatedly by the defense. Because when all the evidence is out there, when you have a very simple case such as this one, that's all they can hammer on is reasonable doubt." VRP (Jan. 15, 2014) at 413. Immediately following this comment, she read the jury instruction defining "reasonable doubt" as "one for which a reason exists" and "a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all the evidence or lack of evidence." *Id.* at 413-14. The prosecutor did not misstate or mischaracterize what the standard requires, and the remarks were not flagrant and ill intentioned.

Second, Albarran argues that the prosecutor improperly expressed her personal opinion on Albarran's character when she called him "a liar and arrogant." PRP at 25. It is improper for a prosecutor to express an opinion regarding "the credibility of witnesses or the guilt or innocence of the accused." *State v. Calvin*, 176 Wn. App. 1, 19, 316 P.3d 496 (2013). However, prosecutors "'are permitted latitude to argue the facts in evidence and reasonable inferences' in their closing

arguments." *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003) (quoting *State v. Smith*, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985)). The scope of the prosecutor's argument "'must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct.'" *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 706, 286 P.3d 673 (2012) (plurality opinion) (quoting AM. BAR ASS'N, Standards for Criminal Justice std. 3-5.8 (2d ed. 1980) (ABA Standards)). We presume that jurors follow the trial court's instructions. *Coogan v. Borg-Warner Morse Tec Inc.*, 197 Wn.2d 790, 807-08, 490 P.3d 200 (2021).

Here, the prosecutor attacked Albarran's credibility as a witness, but she relied on Albarran's own statements to do so. After highlighting multiple inconsistent statements, the prosecutor declared, without objection, "He lies." VRP (Jan. 15, 2014) at 426. Albarran had told different people different stories when discussing his employment and his relationship with DD, among other things. Therefore, this statement was an inference based on the evidence, and it was not flagrant and ill intentioned.

Albarran also claims it was unfair that the State argued he "'lied'" about domestic violence in his relationship with DD because he was not permitted "to support his assertion that [DD] had assaulted him" with additional testimony. PRP at 24-25. Even if Albarran had been able to provide additional testimony detailing times when DD allegedly hit him, it would not have changed the fact that Albarran told a Child Protective Services worker there was no domestic violence in their relationship. These statements would remain inconsistent, and the prosecutor was therefore permitted to argue that Albarran was untruthful based on this evidence.

Similarly, the prosecutor relied on Albarran's own testimony to argue that he was arrogant. In its closing, the defense argued that the State often relies on confessions when it takes a case to

trial and emphasized that Albarran never confessed. In rebuttal, the prosecutor argued, without objection: "I'll . . . tell you why someone would take this trial. Why this defendant would take this trial. *This defendant is arrogant*. He cheated on [DD] by her count four times, by his a gazillion. And each time he was able to talk his way back into the house." VRP (Jan. 15, 2014) at 451 (emphasis added). "Even with DNA evidence, he thinks he can tell you, I don't know; I don't know how my DNA got there. How many times do you think he used that?" *Id.* The evidence admitted at trial included Albarran's repeated references to cheating during his relationship with DD. The prosecutor's argument was arguably an inference based on this evidence, it does not rise to the level of being flagrant and ill intentioned, and a curative instruction could have cured any prejudice.

The prosecutor also argued more generally, "Child molesters are arrogant." *Id.* at 452. This blanket statement was inappropriate and not based on the evidence, but defense counsel objected to the remark, and the trial court sustained the objection. The jury was instructed to disregard the general characterization and to focus on the evidence in the case. We presume that jurors follow the trial court's instructions, so we conclude there is not a substantial likelihood that this remark affected the jury's verdict. *See Coogan*, 197 Wn.2d at 807-08.

Third, Albarran argues that the prosecutor "suggested to the jury that there might be additional evidence which they had not heard" regarding his criminal history. PRP at 25. During rebuttal, the prosecutor argued, without objection, Albarran "raises . . . these other crimes that the defendant was not found guilty or -- the defendant had no criminal history. He presupposes that we would even be able to bring that and put that in front of you if he did. And that's nothing for

you to consider." VRP (Jan. 15, 2014) at 453. This phrasing could have suggested to the jury that there was something in Albarran's criminal history that it had not been told.

"[I]t is error to submit evidence to the jury that has not been admitted at trial." *Glasmann*, 175 Wn.2d at 705. Additionally, it is possible that "'the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office but also because of the fact-finding facilities presumably available to the office.'" *Id.* at 706 (quoting ABA Standards std. 3-5.8). However, Albarran fails to show that these comments were flagrant and ill intentioned. In context, they were a response to Albarran's emphasis on his lack of criminal history. And even if the prosecutor's statement did improperly suggest that Albarran had prior arrests or criminal history that was being hidden from the jury, Albarran fails to show a curative instruction would have been insufficient to address the prejudice. Albarran clearly testified that he had no prior convictions, and the State did not rebut this evidence. The prosecutor also told the jury *not* to consider Albarran's criminal history, and the State presented both DNA evidence and eyewitness testimony to support the allegations against Albarran.

Finally, Albarran argues that his counsel's failure to object to the prosecutor's arguments amounted to ineffective assistance of counsel. "Defense counsel's failure to object to a prosecutor's closing argument will generally not constitute deficient performance because lawyers 'do not commonly object during closing argument absent egregious misstatements.'" *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 721, 327 P.3d 660 (2014) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 717, 101 P.3d 1 (2004)), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). Here, for the same reasons the prosecutor's arguments were not improper, they were not so egregious that defense counsel's

failure to object amounted to ineffective assistance. Nor would objections have affected the outcome of the trial.

The prosecutor's discussion of the beyond a reasonable doubt standard did not misstate the State's burden of proof. The prosecutor's arguments that Albarran had lied and was arrogant were conclusions she drew after reciting specific evidence presented and, thus, there is not a reasonable probability that objections to these characterizations would have impacted the outcome of the trial. Even if we assume the prosecutor's discussion of Albarran's lack of criminal history was objectionable, that too would not have impacted the outcome at trial, given that both DNA evidence and DD's eyewitness testimony supported the conviction.

In sum, we hold that Albarran fails to establish prosecutorial misconduct entitling him to reversal and a new trial.

## CONCLUSION

Albarran fails to show that his trial counsel was constitutionally ineffective either before or during trial or that prosecutorial misconduct deprived him of a fair trial. Accordingly, we deny Albarran's petition.

No. 51575-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Glasgow, J.

We concur:

_____
Lee, C.J.

_____
Worswick, J.

27